16938

MRS. FREDA RODGERS et al., Respondents, v. MRS MAE HER-
RON and THE CITIZENS & SOUTHERN NATIONAL
BANK OF SOUTH CAROLINA, of whom The
Citizens & Southern National Bank of
South Carolina, is, Appellant

(85 S. E. (2d) 104)

318

*Messrs. Hagood, Rivers & Young* of Charleston, and *Haynsworth & Haynsworth,* of Greenville, *for Appellant,*

*Messrs. W. E. Bowen* and *Williams & Henry,* of Greenville, *for Respondents,*

December 10, 1954.

LEGGE, Justice.

The will of A. F. Klaren, who died in 1935, directed that the executor, The Atlantic Savings Bank of Charleston, have charge of the corpus of the estate and pay over the income to his widow, Mae Klaren, during her widowhood, and, upon her death or remarriage, in equal shares to his children, until the youngest should have attained the age of twenty-one years, and thereupon distribute the corpus among them in equal shares. Surviving the testator were his widow and seven children. The Atlantic Savings Bank of Charleston, which later became The Citizens and Southern National Bank of South Carolina, entered upon the performance of its duties as executor and trustee in 1935, and paid over the income to the widow until August, 1949, when this action was commenced by the children against her and it, the complaint alleging that she "has married one G. T. Herron, and that the said Mae Herron and G. T. Herron are now, and have for many years been, living together as man and wife," and that the plaintiffs (respondents here) were therefore entitled to the income, and praying: (a) for title to or possession of the income of said property; (b) for an Order restraining the defendant Mae Herron from receiving, and her codefendant from paying to her, any part of the estate; and (c) for such other and further relief as to the court might seem meet and proper.

The defendant Mae Herron made no answer, and was adjudged in default. The bank answered, denying any knowledge or information sufficient to form a belief as to the al-

leged marriage of the individual defendant, alleging that it had been paying the income from the estate to Mrs. Mae Klaren, and praying instructions as to the handling of the estate in its future transactions as executor and trustee under the will.

The cause was referred to the Master for Greenville County, who, after hearing testimony, submitted his report dated October 11, 1949, in which he found among other things that in 1940 Mrs. Mae Klaren had moved from Charleston to Greenville County and had there become the common-law wife of G. T. Herron "some time prior to the institution of this suit; * * * that the testimony indicates that they were married in June, 1940"; that by her marriage to G. T. Herron she had forfeited her right to any interest that she might have had in the estate of her deceased husband; that therefore the children of O. F. Klaren were the owners of the property of O. F. Klaren under the will and entitled to the income; and that the youngest child, Ann Klaren, became fourteen years of age on February 17, 1949. No exceptions to this report were filed, and in due course it was confirmed by decree of the Honorable G. Duncan Bellinger, then presiding in the Thirteenth Circuit, dated October 26, 1949. The decree, from which no appeal was taken, adjudged among other things "that the plaintiffs, under the terms of said will, upon the marriage of the said Mrs. Mae Klaren to G. T. Herron, became, and are, the owners of the property of the said O. F. Klaren under said will, and are entitled to the 'title or possession to the income of' the property referred to in said will."

Thereafter the plaintiffs, by petition in the cause, alleged that the defendant bank had paid them the income accruing since the date of the institution of the suit, but had refused to pay to them the income from the time of their mother's remarriage to the date of the institution of the suit; "that they are entitled to an order referring this phase of the matter to Honorable E. Inman, Master, to take testimony and report to the Court his findings as to the amount of the in-

come from said estate due petitioners from June, 1940, the date of said marriage as found by said order of Judge Bellinger, until August 8, 1949, the date of the institution of said suit; if, however, the said order of Judge Bellinger should be construed as not fixing definitely the date of said marriage, that as an incident to the determination of the amount of said income due petitioners, that testimony be taken to determine the date of said marriage"; and they prayed that the matter be referred to the said Master to take testimony and report his conclusions of law and fact.

To this petition the defendant bank filed its return, alleging that the issues sought to be raised by the petition were foreign to those made by the complaint in the cause, and that any claim that the plaintiffs might have against it because of alleged improper payment or disbursement of funds prior to the commencement of the suit should be made in a new and different action against it; and praying that the petition be dismissed. The issue thus made came on to be heard before the Honorable J. Frank Eatmon, Presiding Judge, who by his order dated December 23, 1950, dismissed the petition, holding that the pleadings had raised no issue as to income for the period of time intervening between the date of Mrs. Klaren's remarriage and the time of the commencement of this action. On appeal by the plaintiffs to this court the judgment of the lower court was reversed and the cause was remanded for the purpose of determining the amount of the estate's income and disbursements thereof from the time Mrs. Klaren became Mrs. Herron, and to determine what amounts, if any, were due appellants, and the liability, if any, of the bank therefor; the appellants were given twenty days after the filing of the remittitur within which to make and serve on the respondent bank such amendments to their pleadings as they might be advised; and the bank was given a like period thereafter within which to make and serve on appellants such amendments to its pleadings as it might be advised, following which appellants were given twenty days within which to reply to new matter

in the bank's pleadings. *Roger v. Herron,* 220 S. C. 264, 66 S. E. (2d) 873.

Thereafter the bank filed its amended answer to the complaint and an amended return to the petition before mentioned. The amended answer contained, in addition to those of the original answer, allegations to the effect that the bank had not, until the commencement of the action, received from any responsible person sufficient information that the widow was no longer entitled to receive the income of the estate to justify it in stopping such payments. The amended return contained like allegations in addition to those of the original return.

Respondents then moved before the Master to strike the amended answer for the reason that the only pleadings before this court on the former appeal were the petition and the bank's return thereto, and that the order of this court allowing the parties to amend their pleadings had reference to those pleadings only and not to the original complaint or answer.

Following a reference on February 11, 1952, the testimony adduced at which we shall discuss later, the Master filed his report on July 21, 1952, in which he (a) refused the motion to strike the amended answer, (b) held that the bank had acted with complete good faith and due diligence and was therefore not liable to pay from its own funds the amounts which it had paid to the widow between the time of her remarriage and the commencement of this action, and (c) recommended that the complaint be dismissed as to the defendant bank.

Plaintiffs having excepted, the matter came before the Honorable J. B. Pruitt, Presiding Judge, who under date December 21, 1953, issued his decree sustaining the exceptions to the master's report, and adjudging that the defendant bank pay to the plaintiffs sixteen thousand sixty-nine and 86/100 ($16,069.86) dollars, being the amount of the income of the estate for the period beginning July 1, 1940,

"the date following their mother's marriage," to August 8, 1949, the date of the commencement of this action. From this decree the bank now appeals.

We shall discuss briefly the testimony of Mr. L. W. Barrett, trust officer of the appellant bank, who was the only witness examined at the reference on February 11, 1952. In August, 1944, he received from Mrs. Klaren the following letter:

"Aug. 14–1944

"Mr. L. W. Barrett

"Dear Ser

"Jest a few line to day in regard of me I wood like to know if you can fix it with the Probate Courts so I can get marred. and get my income tell the Baby is 21 years old But if you cent I will stay singel so let me know whart you can dew for me.

"Thinkin you

"Mrs. Mae. Klaren
"Pelzer, S. C.
"Gen Del"

His reply follows:

"Aug. 17, 1944

"Mrs. Mae Klaren
"Pelzer
"South Carolina
"Dear Mrs. Klaren:

"In reply to your letter of August 14, there is nothing I can do that will make it possible for you to marry again and continue to receive the income from the Trust. The will is very specific on this point, stating that you are entitled to the net income 'during the term of her natural life or until she shall marry."

"It does not appear that I will be able to send you any more money monthly than we have been paying you in the last two years because the rents provide just about enough

to pay you what we have been giving you and to provide for the taxes, insurance and repairs on the properties.

> "Yours very truly
> "L. W. Barrett
> "Trust Officer"

LWB :FS

Following her receipt of Mr. Barrett's letter of August 17, 1944, Mrs. Klaren came to Charleston and asked him in person if he would go to the Probate Judge and see if there was any way by which, if she should remarry, she could still get the income from the estate. Mr. Barrett told her that he could not do that, the will being very clear on the point, and she replied that she would remain single.

Under date March 5, 1946, the respondent Mrs. Gertrude Noonchester wrote to Mr. Barrett as follows:

> "March 5, 1946

"Citizens & Southern National Bank
"Charleston, South Carolina
"Dear Mr. Barrett:

"My mother is still receiving monthly checks from you from the Will of my father, O. Fred Klaren, and she is married, or at least I understand it would be called married, because she has been living with him for at least six (6) years. She signs her name Mae Herron on everything except the check you send her she signs Mae Klaren in order to keep getting that check in which this man Tony G. Herron is taking it and living off it. He does not work he lays around the house and live off of my dead fathers money which, he worked hard for and saved for his children. I do not think it is fair for him to have a good living and us children have to do without. He has turned her against her children, she never does visit any of them. Four of us children are married and three are going to school and the baby Ann is the only one home with mother and the other two Betty and Helen are off going to a Boarding School. They work part of their way in school.

"I would appreciate it very much if you would write me and let me know if anything could be done. If the check could be divided among the 7 children instead of Mother, so that each child could have the same amount and see that Mother has a good living and taken care of so that man Tony Herron couldn't have it all and spend it like he has been spending it. I know that my father O. Fred Klaren would not want another man to come in and spend his money and take away from his children in which he is doing. I would appreciate it very much if you would not mention my name to my mother that I have wrote and told you this information because, I wouldn't want her and him to be mad with me and have any hard feelings against me.

"I am sending you a proff for you to see that she has signed her name Mae Herron.

"Yours truly,

"Mrs. Gertrude (Klaren) Noonchester
"Balfour, N. C."

Mr. Barrett replied as follows:

"March 29, 1946

"Mrs. Gertrude Noonchester
"Balfour, N. C.
"Dear Mrs. Noonchester:

"I refer to your letter March 5th and return the card which you enclosed.

"Your father's Will has the following provision:

" 'I devise and bequeath all of the property of which I die, seized and possessed to my beloved wife or until she shall marry. Upon the death or marriage of my beloved wife I devise and bequeath all of the said property of which I die seized and possessed to my children' and further, that the Bank 'shall pay over the income of my said property to my wife or children as above directed by me.'

"We are obligated to pay your mother the income from your father's estate until legal and sufficient proof is offered that she has remarried. This proof will have to be made

openly with your mother's knowledge. We cannot, therefore, act on your letter.

> "Very truly yours,
> ."L. W. Barrett
> "Trust Officer"

Under date July 31, 1948, the respondent Helen Klaren wrote to Mr. Barrett, as follows:

> "Southern Missionary College
> ."Collegedale, Tenn.
> "July 31, 1948

"Citizens and Southern Bank
"P. O. Box 951
"Charleston, S. C.
"Dear Mr. Barrett:

"This is to inform you that I have finished training. I am now teaching school. I want to thank you for making it possible for me to complete my training. My other sister Betty has finished also.

"My mother has only the youngest sister with her now. Being that Mother has married again she only needs money for Ann, the youngest sister. I would appreciate it very much if you would cut her allowance and not send her any extra money during the month. I know she is always writing for extra money saying there is sickness and etc.

"From observation I know the houses need painting and repairing badly.

"Mr. Barrett, this is very confidential. My mother has been married for 10 years. She doesn't want you to know it as her income would stop on account of the will. Her husband is well and could work, but he hasn't earned $200.00 in ten years time.

"I ask you in respect to my father to please cut her allowance as then her husband would have to work like an honest man instead of living from the money that my father left.

"This extra money could then go toward repairing the homes.

"Thanking you for everything.

"Sincerely yours,
"Helen Klaren
"Southern Missionary College
"Collegedale, Tenn."

"P. S. If you have any advice about this, let me know by return mail."

To this letter Mr. A. R. Simonds, Vice-President of the appellant bank, replied as follows:

"August 3, 1948

"Miss Helen Klaren
"Southern Missionary College
"Collegedale, Tenn.
"Dear Miss Klaren:

"Your letter of July 31, 1948, is acknowledged. Mr. Barrett is on vacation.

"Your father's will has the following provision:

"I devise and bequeath all of the property of which I die seized and possessed to my beloved wife for and during the term of her natural life or until she shall marry. Upon the death or marriage of my beloved wife I devise and bequeath all of the said property, of which I die seized and possessed to my children."

"And further that the Bank
"shall pay over the income of my said property to my wife or children as above directed by me."

"We are obligated to pay your mother the income from your father's estate until legal and sufficient proof is offered that she has remarried. This proof will have to be made openly with your mother's knowledge. If you wish to bring action in a court to establish the marital status, we, of course, will abide by the decision. We cannot, therefore, act on your letter alone.

"Yours very truly,
"A. R. Simonds
"Vice President"

Except to reply, as quoted above, to Mrs. Noonchester's letter of March 5, 1946, and Miss Klaren's letter of July 31, 1948, the appellant bank did nothing about the matter. It made no effort, either by inquiry of the widow or by independent investigation, to verify or disprove the statement made by two of her children regarding her remarriage. It continued to remit the income by checks payable to the order of Mrs. Mae Klaren, who continued to endorse them in that name.

Most of appellant's twenty exceptions are not necessary for the presentation of the simple issues here involved. Many of them are too general for consideration under Section 6 of Rule 4 of this court. For example:

Exception 1. "That the court erred in not affirming the Master's report."

"Exception 2. "That the court erred in sustaining the exceptions to the Master's report."

Exception 5. "That the court erred in holding that the plaintiffs were entitled to receive any amounts from the defendant bank."

Exception 19. "That the court erred in awarding judgment against the defendant bank in the sum of sixteen thousand and sixty-nine and 86/100 dollars."

Exception 20. "That the court erred in not awarding judgment in favor of the defendant bank, with costs to the bank."

Exception 3 charges error on the part of the circuit Judge in holding that so much of our opinion in the former appeal as permitted amendment of pleadings related only to the petition and return, and that therefore the Master should have stricken the amended answer. In this phase of the litigation the factual issues raised by the amendment of the answer and by the amendment of the return being identical, the issue sought to be raised by this exception is academic and does not require determination. Moreover in his decree Judge Pruitt, after holding that our opinion had reference to the amendment of the petition and

the return only, went on to say: "However this may be, I do not think it makes any real difference, as to this point, for the reason that the facts of the case are the same in whichever view the matter may be considered. I shall, therefore, consider this case in the light of the amended answer and amended return."

Exception 4 charges that the lower court erred in not holding that there was no language in the complaint which charged the defendant bank with any delict and which would entitle plaintiffs to any judgment against the defendant bank. The question of the sufficiency of the pleadings to support a recovery against the appellant bank is foreclosed by our former opinion. *Roger v. Herron, supra.*

The remaining exceptions need not be separately discussed. They present, from various angles, the substantial issues in the case, namely:

1. By what standard of care are the duties of the appellant as executor of the will of O. F. Klaren to be measured?

2. Under the facts of this case, which are undisputed, has the appellant measured up to that standard? If not,

3. To what extent is the appellant liable?

" 'The general rule in reference to the accountability of trustees is that they shall use such diligence in the management of the trust fund as a prudent man would do in relation to his own affairs, and that they shall not be charged with loss except for neglect of duty'." *International Shoe Co. v. United States Fidelity & Guaranty Co.,* 186 S. C. 271, 195 S. E. 546, 549; *Turnipseed v. Sirrine,* 60 S. C. 272, 38 S. E. 423; *Epworth Orphanage v. Long,* 207 S. C. 384, 36 S. E. (2d) 37; *Weston v. Weston,* 210 S. C. 1, 41 S. E. (2d) 372.

Equally well settled is the rule that a trustee who departs from the express directions of the trust instrument, or who undertakes to decide for himself who is entitled to receive payment of the trust fund, does so at his peril.

In *Klugh v. Seminole Securities Company,* 103 S. C. 120, 87 S. E. 644, 646, this court said:

"It is true the trust was express, and it is also true the trustees were bound by the law to conform to the terms of it, and for a failure to do so they are liable to the *cestui que* trust in the event of a loss of the fund. This inquiry is distinct from that of ordinary care by the trustee, and from that of good faith by the trustee."

And in *Crayton v. Fowler,* 140 S. C. 517, 519, 139 S. E. 161:

"* * * and although he (the Trustee) is exonerated from any moral turpitude in the matter, it is clear under the law and the facts of the case that he must be held personally responsible for said loss. It is a general rule of law that when a trustee departs from the directions contained in the trust instrument he is liable for any loss occasioned, irrespective of good faith or his best judgment. 26 R. C. L. 1307, 1308; 44 L. R. A., N. S., 876; *Womack v. Austin,* 1 S. C. 421; *Sanders v. Rogers,* 1 S. C. 452; *Klugh v. Seminole Securities Company,* 103 S. C. 120, 87 S. E. 644; 2 Perry on Trusts, § 847."

To quote from *Womack v. Austin,* 1 S. C. 421, 438:

"Chief Justice Dunkin, in *Snelling v. McCreary,* 14 Rich. Eq. 291, 300 says: 'When left to his own judgment, the trustee must exercise his discretion in the manner in which a prudent man would in the management of his own affairs.' Where, however, the course which he is to pursue is dictated and directed by the authority which originates the trust, he is provided with a chart from which he is not allowed to depart unless forced by a necessity which he cannot resist."

"An administrator who of his own accord undertakes to decide who are entitled to the estate, and makes distribution accordingly, acts at his peril." 21 Am. Jur. Executors and Administrators, page 645, Section 471.

And in the Restatement of the Law of Trusts, Volume 1, Section 226, we find the following:

"If by the terms of the trust it is the duty of the trustee to pay or convey the trust property or any part thereof to a beneficiary, he is liable if he pays or conveys to a person who is neither the beneficiary nor one to whom the beneficiary or the court has authorized him to make such payment or conveyance."

From the foregoing the following rules with respect of the standard of care required of the trustee in the management and disposition of the trust property may be taken as established:

1. In the management of the trust he must exercise reasonable care, prudence and diligence;

2. If he departs from the express provisions of the instrument creating the trust, he does so at his peril, and neither good faith nor the exercise of his best judgment will absolve him from liability;

3. His duty to make payment or delivery of the trust property to the proper person or persons is, in general, absolute.

The conflict between the rules above outlined is more apparent than real. Where the terms of the trust instrument are free from doubt, the trustee who disregards them is guilty of negligence, to say the least. Where they are not clear, or where there is doubt as to who is entitled to receive payment of either the principal or the income of the trust fund, it is the duty of the trustee, in the exercise of the care and diligence to be expected of a prudent man, to apply to the court for instructions. Essentially, therefore, the standard of conduct remains the same throughout the performance of the duties of the trust. That the trustee is held to have acted at his peril when he violates the express provisions of the trust or undertakes, without the aid of the court, to resolve a doubt as to the identity of a beneficiary, is but to say that generally in those circumstances he is negligent as a matter of law.

In respect of the trustee's liability resulting from payment to the wrong person after the right of the original beneficiary has been terminated, application of the rule of absolute liability depends largely upon the circumstances of the case, and particularly upon the nature of the event whereby the right of the original beneficiary has been terminated. It is generally applied where the right of the original beneficiary has been terminated by his death.

"So also it would seem that the trustee is liable where a beneficiary signs a power of attorney authorizing a person to receive payment from the trustee for the beneficiary, and the trustee makes a payment to the person after the death of the beneficiary, although the trustee makes the payment in ignorance of the death of the beneficiary and the consequent termination of the power. By statute in England the trustee is protected in such a case." Scott on Trusts, Section 226.

In the case of *Darling Stores v. Fidelity-Bankers Trust Company,* 178 Tenn. 165, 156 S. W. (2d) 419, 421, the beneficiary of a trust, living in the same city in which the trustee had its place of business, became insane and was placed in an asylum in the same city and thereafter died in the hospital there, and thereafter the trustee, over a period of two years, issued checks payable to the order of the deceased beneficiary, which were received by his widow and endorsed by her " 'Edward Wilson by Mrs. Wilson'." The principal issue before the court was concerned with the law of negotiatiable instruments, but the court, applying the standard not of absolute liability but of ordinary care, suggested that the trustee had been negligent in the circumstances.

Nor is the rule of absolute liability applicable where the original beneficiary has assigned his interest without notice to the trustee. Accordingly, we find in the Restatement of the Laws of Trusts, at page 642, the following comment: "If the beneficiary transfers his interest and the trustee having no notice of the transfer makes a payment

or conveyance to the transferor-beneficiary in accordance with the terms of the trust, the trustee is not liable to the transferee. If the beneficiary transfers his interest and the trustee makes a payment or conveyance to the transferor-beneficiary when the trustee has notice of the transfer, the trustee is liable to the transferee."

In *Re Thaw's Estate*, 1916, 252 Pa. 99, 97 A. 108, 110, where the trustee was a bank in Pennsylvania and the life beneficiary of the trust had been adjudged insane in New York and committed to the State Hospital there, the court held that the trustee properly charged the trust account with the expense incurred by the trustee in connection with the examination of the beneficiary as to his sanity, and properly withheld payments of income to him during his mental disability. To quote from the opinion in that case:

"It was neither more nor less than common prudence for the trustee, after knowledge of the fact that the appellant had been judicially declared a lunatic and was held in restraint in consequence, to withhold from him the semi-annual payments of income. Payment to him thereafter so long as his mental disability remained might well have been imputed as negligence, notwithstanding the fact that the lunacy had been declared in the course of a criminal trial in a foreign state. It was the knowledge of this fact that put the trustee upon notice, and it could not thereafter continue its payments without incurring risk itself and imperiling as well the estate, which it was its highest duty to protect and conserve."

Whether or not a trustee should be held to absolute liability for payments made to a beneficiary whose rights have been terminated by a ceremonial marriage of which the trustee had no knowledge is a question which has not been answered in any decision that has been brought to our attention, or that we have been able to find; and we are not called upon to answer it here. In distinction from the marriage with which we are here concerned, a ceremonial marriage is an event the happening of which can be fixed at some precise time. A common law marriage, on the other

hand, depends upon facts and circumstances evidencing a mutual agreement to live together as husband and wife, and not in concubinage. *Tedder v. Tedder,* 108 S. C. 271, 94 S. E. 19, 2 A. L. R. 438. Such facts are often difficult of ascertainment where the intent of the parties has not been formally and publicly declared; and especially difficult is it, in such circumstances, to fix precisely the time at which the common law marriage may be said to have come into being. Somewhat analogous is the situation that exists where the issue is insanity. Circumstances may indicate insanity, but ordinarily the fact cannot be established with certainty until there is an adjudication.

Obviously, the rule of reasonable care, rather than ██ ██ of absolute liability, should govern the instant case.

Appellant should not be held liable for payments made to Mrs. Klaren between the date of her marriage and the date of its receipt of Mrs. Noonchester's letter of March 5, 1946. There is nothing in the evidence upon which appellant can be charged, during that period, with knowledge of the remarriage. We do not agree with the finding of the Circuit Court that Mrs. Klaren's letter to Mr. Barrett dated August 14, 1944, and her conference with him later that month, were of such nature as to indicate the likelihood that she would remarry. While it is true that in both her letter and the conference she indicated her desire to remarry provided she could continue to receive the income from the estate, she was positive in her statement on both occasions that she would not remarry otherwise. It is manifest, however, that in failing to make any investigation or inquiry as to Mrs. Klaren's marital status after its receipt of Mrs. Noonchester's letter, appellant was negligent. It attempts to excuse its inaction because of Mrs. Noonchester's request that her name be not mentioned, and on the ground that investigation might have involved "grave charges of moral turpitude" against Mrs. Klaren and thus subjected the bank to embarrassment and possible liability in damages. But such excuses are without merit. In the exercise of ordinary

care, prudence and diligence, it should have at once stopped payments to Mrs. Klaren, made investigation to determine her marital status, and, if a probable case of common law marriage appeared, sought instructions from the court.

In his decree the circuit judge found that the amount which appellant improperly paid to Mrs. Klaren after its receipt of Mrs. Noonchester's letter was Six Thousand Forty and 64/100 ($6,040.64) Dollars. For this amount respondents are entitled to judgment.

The decree of the circuit court is modified accordingly.

TAYLOR and OXNER, JJ., concur.

STUKES, J., not participating.

·J. FRANK EATMON, Acting Associate Justice, disqualified.