Argued June 16, reversed October 5, 1960

In the Matter of the Estate of
HOPKIN JENKINS, Deceased
UNANDER *v.* UNITED STATES NATIONAL
BANK et al
355 P. 2d 729

*William E. Dougherty,* Special Assistant Attorney General, Portland, argued the cause for appellant.

With him on the briefs was Robert Y. Thornton, Attorney General, Salem.

*Robert R. Rankin,* Portland, argued the cause and filed a brief for respondent The United States National Bank of Portland (Oregon).

Before McAllister, Chief Justice, and Warner, Perry, Sloan, O'Connell, Goodwin and Millard, Justices.

WARNER, J.

The appellant, State of Oregon, acting by and through the State Treasurer, appeals from an order of the Circuit Court of Multnomah County (Department of Probate) holding that funds of the estate of Hopkin Jenkins, deceased, accruing to the testamentary trust, hereinafter more particularly described, are exempt from inheritance tax charges. His executors and the testamentary trustee, as respondents, defend the holding of the lower court.

Mr. Jenkins' died July 21, 1956. His will was executed September 20, 1948. The provision (subparagraph 2 of Article IV) which inspires this appeal reads:

"TRUST NO. 2: I bequeath to THE UNITED STATES NATIONAL BANK OF PORTLAND (OREGON), IN TRUST and in perpetuity, and all accretions thereto, sums of money consisting principally of One Hundred Thousand ($100,000.00) Dollars of the appraised value of my estate either in cash or securities or both, including any shares of capital stock in the Jenkins Estate Company, an Oregon corporation, in my estate at its appraised value, together with any remainder hereinafter defined, to constitute the corpus of this trust

estate, to be held by said trustee for the following purpose:—

"—for the purpose of providing a fund of money for the advanced education of qualified boys and girls, beyond that of high school requirements. (15%)

"This perpetual educational trust is established to the glory of God and the memory of my father, Thomas W. Jenkins, my mother, Mary Jenkins, and my brother, Albert E. Jenkins, and the years of service I was permitted to render the educational system in the State of Oregon mostly as Principal of Jefferson High School at Portland, Oregon.

"I desire the fund be designated as 'Thomas W. Jenkins, Mary Jenkins, Albert E. Jenkins and Hopkin Jenkins Student Loan Fund' and for brevity referred to as the 'Jenkins Student Loan Fund.'

"Out of my familiarity with and the performance of obligations similar to those hereof, I have compiled a Code of Procedure for the direction of the trustee or trustees in the execution of this trust. Said Code is in no way to be construed as a part of this testamentary expression, but I do ask of those who administer it that in so far as my directions therein do not, under the unforeseen circumstances of the future, interfere with the trustor's obvious purposes, the Code provisions be followed. This Code of Procedure will be kept with my will, come into the hands of my executors and be by them delivered to and held by the bank trustee for the guidance of all."

It will be observed that the gift in question does not expressly limit the use of the student loan fund to uses "within this state."

The circuit court held that the foregoing bequest is one "to a person or persons or association of persons in trust for educational uses *within the State of Oregon,* and is exempt from taxation as provided by ORS 118.020." (Emphasis supplied.)

The issue presented by the appeal is whether the educational charity as established by the testator is exempt from inheritance tax under ORS 118.020. In its narrower aspect the issue may be stated thus: Are the funds provided for the trust limited to "educational uses within the State of Oregon"?

ORS 118.020 makes provision for such exemptions from inheritance tax as may be accorded to benevolent, charitable, religious or educational institutions. The pertinent part thereof in which we have interest reads:

"(1) Devises, bequests, legacies and gifts are exempt from taxation under the provisions of ORS 118.005 to 118.840, if made:

"(a) To any benevolent, charitable, religious or educational institution, society, association or corporation organized and existing within this state and actually engaged in carrying out the objects and purposes for which so organized or existing; or

"(b) To a corporation, association or society to be organized for such purposes under the laws of this state pursuant to the terms of the instrument providing such devise, bequest, legacy or gift; or

"(c) To a person or persons or association of persons in trust for benevolent, charitable, religious or educational uses within this state."

Indeed, our particular interest centers upon subsection (c) of the foregoing where we find the significant words of limitation: for "uses within this state." We find no ambiguities in the statute which necessitate resorting to rules of construction.

∎ There is no question that a student loan fund does constitute a charitable or educational use fully as much as would a scholarship fund. By making available funds at a relatively low rate of interest to quali-

fying persons, the loan fund serves a purpose as charitable as it is meritorious. Clearly, this is an educational use within the meaning of the language of ORS 118.020(1)(c). Support for this view may be found in the following authorities and the cases which they cite. 4 Scott, Trusts (2d ed), 2648, 2726, §§ 370.5, 376; Anno 33 ALR 2d 1183 (1954).

Oregon's limitation of the charitable exemption to domestic charity is not peculiar to this jurisdiction. Similar statutory limitations are common in other jurisdictions and have occasionally been imposed by the courts even in the absence of statutes. See 2 Bogert, Trusts and Trustees, 352, § 290(b).

In this state such restrictions have a long history. Restrictions to Oregon corporations may be found in Oregon Laws 1903, p 49, § 1. Gifts in trust to persons were so restricted by statute in Oregon Laws 1905, ch 178, p 309, § 1; Oregon Laws 1919, ch 392, p 697, § 1. After 1925 there was a restriction upon use in the United States. Oregon Laws 1925, ch 338, p 688, § 1; Oregon Laws 1931, ch 332, p 569, § 1; Oregon Laws 1933, ch 26, p 44, § 1. However, in 1939 we returned to a restriction to use within this state. The language with which we are now concerned was inserted at that time. See Oregon Laws 1939, ch 148, p 300, § 1 (now ORS 118.020).

We are concerned, therefore, with no mere inadvertent use of language. Such a restriction has been a part of the public policy of this state in some form for nearly half a century. The legislative history of this particular language re-emphasizes the intent of the legislature to restrict rather than to expand the scope of such gifts. When the bill of 1939 was originally passed by both houses of the legislature unanimously it did not contain the instant provision. 1939

Senate and House Journals, 114, 443, 131. But before the governor could sign the bill it was recalled and the provision inserted. Ibid. 160, 521.

The rationale of policy consideration giving rise to limitations on tax exemptions to charities finds expression in *In re Prime's Estate,* 136 NY 347, 32 NE 1091, 1095, LRA 713 (1893). There, the Court of Appeals of New York declared: "It is the policy of society to encourage benevolence and charity. But it is not the proper function of a state to go outside of its own limits, and devote its resources to support any cause of religion, education, or missions for the benefit of mankind at large." *Carter v. Whitcomb,* 74 NH 482, 69 A 779, 784, citing Prime, supra, speaks in the same tenor, the court saying: "The state is not itself a charitable institution, and does not authorize its representatives to expend the public money, by exemptions from taxation or otherwise, for purposes having little or no relation to the welfare of the inhabitants of the state. The purpose of such laws is the acquisition of some supposed public advantage.  *  *  **" See, also, *Methodist Book Concern v. State Tax Com.,* 186 Or 585, 208 P2d 319 (1949).

We pause to take note of some fundamental rules which necessarily bear upon our conclusions as to whether the instant scholarship trust falls within the ambit of the tax immunity provided by ORS 118.020 (1)(c).

■ It is a canon of universal recognition that tax exemption statutes will be strictly construed in favor of the state and against the taxpayer. It applies with equal force to inheritance taxes. *In re Bremer's Estate,* 166 Ohio St 233, 141 NE2d 166, 170. But this rule does not foreclose the application of a reasonable construction in order to ascertain the legislative in-

tent. *Multnomah School of the Bible v. Multnomah County,* 218 Or 19, 27, 343 P2d 893 (1959), and cases there cited.

■ Rules of statutory construction will not be invoked where no ambiguity exists, and even if a statute should be deemed ambiguous, we would be required to apply the rule of strict construction, to which we above make reference, and deny the exemption unless it is so clearly granted as to be free of reasonable doubt. *Methodist Book Concern v. State Tax Com.,* supra (186 Or at 592).

■ Charities in this state enjoy no inherent right to exemption from taxation; and are taxable only in so far as they may be specifically exempt by constitutional provision or statutory enactment. *Security Sav. & Trust Co. v. Lane County,* 152 Or 108, 141, 53 P2d 33. There is no presumption or implied exemption from taxation in their favor. *Malad Second Ward of the Church v. State Tax Com'n.,* 75 Idaho 162, 269 P2d 1077, 1079 (1954).

■ The burden is on a claimant to prove or establish clearly a right thereto. *Stebco, Inc. v. Gillmouthe,* 189 Or 427, 437, 221 P2d 914; *Benton County v. Allen,* 170 Or 481, 484, 133 P2d 991 (1943); 84 CJS 432, Taxation § 225; 51 Am Jur 530, Taxation § 527; 2 Cooley, Taxation (4th ed), 1404, § 672.

The state urges that in order for the trust to enjoy the statutory exemption it is necessary that the will expressly limit the trust funds for use within the state. The respondents argue to the contrary and in effect say that if the will does not so limit the uses that extrinsic evidence may be considered to supply that need.

We lay aside for the moment respondents' representation concerning the employment of extrinsic evi-

dence and give heed to the foregoing proposition presented by the state.

"With few exceptions it has been held that transfers otherwise taxable, in order to enjoy the charitable exemption, must be made to local institutions and corporations in trust for use for exempt purposes within the state, or, if the property be conveyed, devised, or bequeathed to natural persons in trust, *its use must be limited by the trust instrument* to charitable, religious, educational, or other exempt uses within the state. * * *" (Emphasis supplied.) 2 Bogert, Trusts and Trustees 352, § 290b.

"* * * an exemption of a trust for any charitable purposes to be carried out within the state does not apply where testamentary trusts to associations for charitable purposes *are not required by their terms to be carried out within the state* for the benefit of residents or objects located therein. * * *

"Exemption statutes have been construed as evidencing the legislative intent that the limitation as to use within the state must be expressed by the terms of the testamentary bequest, * * *." (Emphasis supplied.) 85 CJS 978, Taxation § 1161.

The following cases give support to the foregoing rule as stated by Bogert and CJS: *MacGregor v. Commissioner of Corporations and Taxation,* 327 Mass 484, 99 NE2d 468 (1951); *In re Fleming's Estate,* 31 Cal2d 514, 190 P2d 611, 615 (1948); *Presbyterian Church in U. S. v. Sheppard* (Tex Civ App 1946), 198 SW2d 282, 285; *In re Bremer's Estate,* supra (141 NE2d at 170); *In re Stewart's Estate,* 258 Wis 211, 45 NW2d 687, 689, 47 NW2d 742 (1951); *In re Jussen's Estate,* 263 Wis 274, 57 NW2d 343 (1953).

■ The rule requiring that any intended limitation upon the charity to "uses within this state" must be

expressed by the terms of the testamentary bequest, is not in fact a legal innovation. It is consonant with the primary rule which is by statute in this state reflected in ORS 114.210① and many times judicially stated in the opinions of this court. Among our earlier declarations is *Morse v. Macrum,* 22 Or 229, 233, 29 P 615, 30 P 73 (1892): "This [a question of testamentary intention] must be determined by ascertaining the intention of the testator, to be derived from the language of the will itself; and if this cannot be done, then by resorting to the recognized rules of interpretation in such case." The four corners of the instrument will be looked to, with effect given, if possible, to every sentence, clause and word, in arriving at the testator's intention. *Fields v. Fields,* 139 Or 41, 45, 3 P2d 771, 7 P2d 975 (1932).

Our examination of the instant will has followed the required conventional pattern. We have examined it within its four corners, giving attention to every word and phrase. In so doing, we have not overlooked the representation of revealed intention which respondents attach to certain language found in its Article IV, and the only language of the instrument to which they invite our particular attention. This, they claim as valuable to the court in discovering in certain words of that article the testator's intent to limit the uses of the trust in a manner placing it beyond the pale of liability for inheritance taxes.

Article IV reads in the nature of a general admonition to his trustee with respect to all of five separate trusts established by the will to reach beyond the "letter of the trustee's fiduciary obligation" and conform its administration "with the spirit of the trustor

---

① ORS 114.210: "All courts and others concerned in the execution of wills shall have due regard to the directions of the will and the true intent and meaning of the testator in all matters brought before them."

as gleaned from this record or personal knowledge and in which spirit the service should be rendered." The "spirit of the trustor * * * gleaned from this record [the will]" demonstrates that he was a man magnanimously generous and unselfish whose greatest life and last interest was to further the education of young men and women in the higher echelons of learning after they had finished their high school education. There can be little doubt that this admirable philanthropy was born of his long experience as an educator. We also discover from the will that the decedent was wanting in any species of religious intolerance. This is made evident from his gifts to colleges founded or supported by churches other than his own. Although protestant, he included a bequest to a catholic university and to other church-sponsored colleges, not of his own faith. Beyond that we cannot say, for we find nothing to be gleaned from the will itself that enables us to conclude that the testator's intent conformed in any way to his desire, if such he had, to avoid the tax which the State Treasurer seeks to assess. Nor does this record bring to us what "personal knowledge," if any, the trustee may have which would justify a conclusion contrary to that which we presently entertain. Certainly, it is not made manifest by the testimony of four trust officers of The United States National Bank who collaborated with him for weeks in producing what he finally executed as his last will and testament.

When confronted with such phrasing as found in Article IV, we find ourselves in accord with the following declaration made by the Supreme Court of Kentucky in *Winn v. Williams*, 292 Ky 44, 165 SW2d 961 (1942), at p 964:

"* * * If a man wishes to dispose of his

estate by will he ought to express his desires so they can be accomplished. If he is not able to say what he wants to say or is so negligent that he does not write what he has in his mind, or have someone else to do it, he ought not to expect the courts to read his mind or divine his will by some sort of supernatural power. * * *. " See, also, Thompson, Wills (3d ed), 324, § 212.

"* * * the court may not speculate concerning the testator's intention.

* * * * *

"It is what the testator said in his will rather than what he meant to say that should be determined." Thompson, Wills, supra, at 330.

Our examination of this carefully drawn will for indicia of intent respecting the uses of the funds set aside for the scholarship trust impels the conclusion that it is so clear and free from either patent or latent ambiguities that it leaves no doubt that the testator had fostered no thought of limiting the uses of his charity within the state of Oregon.

As earlier observed in this opinion, the respondents seek to overcome the absence of any language in the will expressly or impliedly limiting the avails for the scholarship trust to uses in the state by invoking extrinsic evidence to supply what they claim to have been the testator's intent in that respect.

The statement is frequently made that recourse may not be had to extrinsic evidence if the will is unambiguous. Thompson, Wills, supra, at 487; 4 Page, Wills (3d ed), 673, § 1627. It has been reiterated by this court. In *Heimbigner v. United States National Bank,* 190 Or 592, 596, 227 P2d 827 (1951), the court said:

"The general rule is that the intention of the testator may be gathered only from the will itself,

and evidence of a different intention than is to be gathered from the language which the testator used in the will is not admissible. This court, in a long line of decisions, has followed this rule. [Citing many Oregon cases.]"

And where it was also said, at p 597:

"The meaning being clear, and there being no ambiguity in the language, there is no room for construction, and this court will not seek to read into the will and codicil an intent different from that expressed therein. * * *"

See, also, *Pioneer Trust Company v. Thielsen,* 199 Or 206, 214, 258 P2d 788 (1953).

Under the authority of the Heimbigner case, supra, we would be justified in concluding this opinion at this point. But without conceding respondents' right to bolster their thesis of the testator's intent by reliance upon evidence extrinsic to the will, we will nevertheless give attention to the matter upon which they most depend to support their argument.

We are moved to indulge in this apparent departure from the rule laid down in the Heimbigner case, supra, for several reasons: (1) the instant matter is one of real public interest involving a very substantial tax potential on the one hand and a sizeable charity on the other; (2) but even if the extrinsic evidence, hereinafter referred to, was properly admissible as subjects compelling consideration, it would avail the respondents nothing, but, to the contrary, would give support to the conclusions we have already reached as to the testator's intent as we have divined it from our examination of the will.

It is fair to say that respondents place more confidence upon a certain phrase found in Mr. Jenkins'

Code of Procedure than in any other particular part of the evidence adduced.

We have earlier noticed that the testamentary provisions for the instant trust refer to a Code of Procedure for the direction of the trustee in the execution of the trust. Article IV which establishes the scholarship trust specifically states at p 11: "Said Code is in no way to be construed as a part of this testamentary expression * * *." Although thus completely divorced from the will as an aid to the discovery of the testator's intent, if his intent is in any way doubtful or ambiguous, the respondents, nevertheless, ask us to invoke it in support for their thesis of a limitation of the trust's uses "within this state."

This collateral instrument was executed contemporaneously with the execution of the will. It is meticulous in its detailed directions for the guidance of the trustee in the administration of the trust, including, among other things, the form of application to be made by prospective borrowers and the form of the notes to be taken from successful applicants.

We understand that the authorship of the procedural code can in the main be ascribed to the pen of Mr. Jenkins. It is Exhibit 5 in this matter. Notwithstanding the minutiae which characterize the document reflecting his wide and considered knowledge in the area of scholarship loans derived from his 15 years of experience as an advisor to the trustee bank in its administration of the Crawford scholarship fund, it contains not one word indicating any restriction on its uses which would warrant the conclusion that the testator contemplated limiting its uses or benefits in any manner which would entitle the charity to the tax exemption claimed.

■ However, respondents cull therefrom one phrase found in Article X of the code, significantly entitled "Income," in support of their contention in avoidance of the payment of inheritance taxes. The phrase upon which they depend reads: "To the fullest extent permitted by law, this trust and its property shall be freed of taxation * * *." The fatal weakness in respondents' assumption that this particular phrase of the document supports their premise is manifested in several different ways. In the first place, the code is addressed not to his executors, but as "a Code of Procedure for the direction of the trustee or trustees in the execution of this trust." Secondly, the proceeds of the scholarship fund would not ordinarily come into the trustee's control until after the executors of the will have in that capacity paid all inheritance taxes legally chargeable against the estate as a part of their statutory duty (ORS 118.230) and as further and more particularly mandated by Article VIII of the will without apportionment. Normally, all estates should be closed and the executor discharged before the executor-trustee commences to perform his duties as trustee. *Bellinger v. Thompson,* 26 Or 320, 329, 37 P 714 (1894); *Roach's Estate,* 50 Or 179, 186-187, 92 P 118 (1907); *In re Buelow's Estate,* 177 Or 218, 229-230, 161 P2d 909 (1945); 2 Jaureguy and Love, Oregon Probate Law and Practice, 80, § 630.

■ Respondents' argument loses much of its force when we remember that the inheritance tax has already accrued before the trustee receives the fund. ORS 118.220; *Staiger v. Holman,* 144 Or 67, 76, 6 P2d 43, 18 P2d 591, 23 P2d 917 (1933). The amount of the corpus which the trustee will control is determined before its authority can be exerted and no action which it may subsequently take can affect the

amount of this tax. *In re Jussen's Estate,* supra (57 NW2d at 345); *In re Colman's Estate,* 187 Wash 312, 60 P2d 113, 116 (1936). Thirdly, the title given to Article X of the code by the testator is indicative that he there had in mind taxes only accruing during the administration of the trust, chargeable to the trustee for income received or other taxes, if any. Lastly, the quoted admonition to free the property of the trust from taxation to "the fullest extent permitted by law" is redundant of the obligation the law impresses upon every prudent trustee, coupled with the possibility of a penalty upon the trustee for an unexcused failure to do that precise thing.

There was admitted as Exhibit 7, without objection, an excerpt from a familiar book of tabloid biographies, entitled "Capitol's Who's Who for Oregon Combined with Who's Who for the Western States 1953." It outlines Hopkin Jenkins' major activities during the 81 years of his lifetime. It is a testimonial to his unselfish interest of the highest order in education, community activities, and public service. It bespeaks a man who though loyal to his city and state was in no sense a provincial, but, to the contrary, one of cosmopolitan tastes and interests, some reaching beyond the bounds of his city and state.

It is difficult for us to believe that a man with such a background and perspicacity was of such limited horizons that he intended to place any limitation upon the free flow of benefits of the scholarship fund in perpetuity by confining it to uses in this state only to evade inheritance tax liability or, independent of tax liability, to limit the enjoyment of its benevolent purpose to persons of the geographical areas in which he lived. If such had been the narrow cast of his mind, we might more naturally expect that

the limitation of use would have been confined to those coming from the city of Portland, where he had spent the major part of his life as a most outstanding educator.

The record also makes evident Mr. Jenkins' considerable experience in the administration of a large scholarship fund during his lifetime. For a period of 15 years following his retirement from active teaching, he sat as one of three resident advisors to The United States National Bank of Portland (his own nominated trustee) in its administration of what is known as the "Crawford Scholarship Fund." In that capacity final approval of applicants was vested in the committee of three advisors. The Crawford trust was one of considerable size established for the same general purposes and with the same objectives that the testator has given to his own scholarship fund.

Exhibit 2 is a narrative recital of salient facts about the Crawford student loan fund. When offered as an exhibit respondents' counsel represented to the probate court that "he [Jenkins] was familiar with it, and his own procedure was modelled substantially after that, with such additions as he thought would be beneficial to his own proposal."

The Crawford trust is without any limitation as to uses outside of the state. We learn that while Mr. Jenkins was an advisor in its administration the fund had received applications from students living elsewhere in the northwest than in Oregon and approved loans in substantial numbers to students from those outside areas for their educational pursuits in colleges variously situated through the United States, as well as some in Europe. We refer to it as merely indicating a large knowledge of the operation of trusts of that character. Certainly, neither Mr. Jenkins' will

nor the collateral code indicate any desire to depart from nor limit the administration of his own scholarship trust in any manner at odds with the administration of the Crawford trust.

If from that experience he deemed the unrestricted use of the Crawford fund as a benefit to students living beyond the borders of Oregon was a defect in that trust and not in conformation with the restricted use that respondents seek to impose upon his will, is it not to be expected Mr. Jenkins would have so indicated in his will or the code? The question is even more pertinent when we again recall the attention he gave to the details which make up his Code of Procedure.

Respondents called four witnesses, all of whom were trust officers of the respondent The United States National Bank. All of these witnesses had participated in some manner in giving valuable advice in connection with the preparation of the instant will. Their testimony discloses personal conferences with testator and his attorney including the substance of letters written to Mr. Jenkins or his attorney concerning certain recommended inclusions and exclusions from preliminary drafts.

Respondents also introduced as their Exhibit 1 a chronological statement prepared by Mr. Jenkins' counsel, setting out in detail the time and nature of conferences had by him with the decedent and decedent's personal friend and tax accountant, Mr. Kronenberg (a party named in the will as a co-executor and in the code as a consultant to the trustee, but deceased at the time of trial), during the period that the preparation of the instant will was under way. This chronological statement of counsel coincides with the records and testimony of the bank as to the time and

nature of conferences which it had with decedent's counsel or with his counsel and Mr. Jenkins together. Taken together, it constitutes a record of wise and wholesome advice on the part of those participating during that period, beginning on June 18, 1948, and terminating by the execution of the final draft of the Jenkins' will and code on September twentieth of the same year.

No criticism can be leveled at any of those who served Mr. Jenkins in the formulation of the will. All very apparently fulfilled their respective obligations to him in a manner reflecting highest credit. No doubt, the tender of this line of testimony was premised upon respondents' belief that it was admissible under ORS 42.220.[2]

It is significant, however, that at no place in that part of the record is there one word said concerning a potential or possible inheritance tax obligation accruing by reason of the scholarship fund. Our respect for the thoroughness of counsel and the thoroughness with which the trust officers of the bank fulfilled their respective obligations to Mr. Jenkins in the matter inclines us to believe that had there been any intent on the part of Mr. Jenkins to create the scholarship trust for uses only within the state of Oregon and particularly to adopt such a limitation in avoidance of inheritance tax duties that it would have been clearly reflected at some point in that part of the record relating to the preliminary preparations of the instant document.

■ In the examination of a will in order to ascertain testator's intention courts will take into consideration

---

[2] ORS 42.220: "In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language he is interpreting."

the ability of the person who drew the instrument correctly to express the terms, objects and purposes desired. *Love v. Walker,* 59 Or 95, 103, 115 P 296; *U. S. Nat. Bank v. First Nat. Bank,* 172 Or 683, 691, 142 P2d 785, 143 P2d 909 (1943).

■ Aside from the matter of Mr. Jenkins' high degree of intelligence, it is difficult for us to believe when we recall that he was a member of the bar (although not an active practitioner) and that in amassing and managing an estate which was appraised at $1,191,-578.48, the testator was not sufficiently tax conscious and conversant with the law to know that the scholarship trust he provided and in the form drawn would be liable to the payment of state inheritance taxes. As we have previously indicated, the will gives every evidence of skillful draftsmanship on the part of the attorney entrusted with the task and then only after due time for a thorough consideration of all of its very particular provisions. It is, therefore, fair to assume that if Mr. Jenkins had intended to limit the uses of the trust within this state, his attorney would have worded it in such a manner to clearly accomplish that result. To us it appears that Mr. Jenkins must have remained silent and did so because he entertained no intention to do that which respondents now attempt to impute to him.

If this is a correct and reasonable conclusion, as we believe it to be, it weighs heavily against respondents' assertions and argument to the contrary. Indeed, we occasionally find citizens who are so grateful for the opportunities and benefits which have been theirs under the aegis of our political system that they graciously meet tax obligations with a sense of making a repayment for the privileges and blessings which they have enjoyed during their lifetime. As

Mr. Jenkins' character is revealed to us by the record here, it is not difficult to believe that he well might have been a citizen of that kind.

We have given attention to respondents' argument under what is denominated Proposition No. IV and find it without merit in this matter, although certain phases of it might commend themselves to the consideration of the legislature as the formulators of the state taxing policies.

The decree of the circuit court will be reversed and each party will pay its own costs.