Argued December 1, 1978, affirmed March 19, reconsideration
denied May 8, petition for review denied June 26, 1979

# UNITED STATES NATIONAL BANK
## OF OREGON, *Respondent,*
### *v.*
## DULING, *Respondent,*
## DULING, *Appellant.*
### (No. A7611-15721, CA 10356)

592 P2d 257

Gary A. Thye, Portland, argued the cause and filed
the briefs for appellant. Fred B. Miller, Portland,

[329]

argued the cause and filed the brief for respondent United States National Bank of Oregon, Trustee of Trust created by Kenneth Duling.

David N. Hobson, Portland, argued the cause and filed the brief for respondent Marjorie Bell Duling.

Before Schwab, Chief Judge, and Thornton, Buttler and Joseph, Judges.

JOSEPH, J.

**JOSEPH, J.**

In this suit for declaratory relief the U. S. National Bank of Oregon, as trustee, seeks an interpretation of a trust instrument, and a declaration of the rights and liabilities of the trustee and the defendant beneficiaries, who are mother (Marjorie Bell Duling) and daughter (Carol Joyce Duling). The daughter filed a "counterclaim" against the bank and a "crossclaim" against the mother, asserting that each of them was liable to her for one-half of the trust income and principal paid to the mother by the trustee since February 6, 1962, amounting to approximately $88,000, plus interest. The trustee responded by asking for restitution from the mother of any amounts the daughter is determined to be entitled to recover from it. The daughter appeals from the trial court's judgment and decree denying her claim. We review *de novo*.

Plaintiff is the trustee under a trust agreement executed in 1948 by Kenneth Duling, husband of Marjorie Bell Duling and father of Carol Joyce, born February 6, 1941. The trust was to be funded with the proceeds of insurance policies on his life.[1] By its terms, trust income is payable to the mother for life. On the mother's death or on the daughter's 40th birthday, whichever should occur last, the trust terminates and is distributable to the daughter.

The third paragraph of Article X of the trust agreement provides the only exception to payment of all trust income to the mother during her lifetime:

> "In the event of the remarriage of the trustor's wife and after the trustor's daughter shall have attained the age of twenty-one (21) years, the trustor directs the trustee to pay one-half (1/2) of the income thereafter to the trustor's wife and the remaining one-half (1/2) to the trustor's daughter, Carol Duling,

---

[1] Under his contemporary will the residue, consisting of everything but the family home and furnishings which went to mother, poured over to the trust.

[331

for the remainder of the lifetime of the trustor's wife. The trustee shall have the power to pay or apply part or parts of the capital of the trust estate not exceeding $2,400.00 in any one year in equal shares to the trustor's wife and daughter during this period."

The dispute in this case centers around the interpretation of this paragraph, and in particular the phrase relating to "remarriage."

When the trust was executed the Dulings operated a large ranch in Terrebonne, Oregon, consisting of land acquired from his parents as well as by purchase from others. Following Kenneth Duling's death in 1950, mother and daughter moved to Portland. On April 1, 1960, mother married Arthur Jaffe, at which time daughter was 19 years old, living at home as she had always done, and attending college. Mother notified the trustee of the marriage and asked how this would alter the payment of trust income. The trustee and Mr. Rankin, mother's attorney, both wrote mother advising her that she would continue to receive all income until daughter reached age 21.

Shortly after receiving those letters, mother separated from Jaffe and began proceedings which culminated in a divorce decree on August 31, 1960. Mother notified the trustee in writing on January 24, 1961, of the divorce and advised the trustee that she had resumed the use of her former name. She testified that she was advised by her attorney that the effect of the divorce before daughter's 21st birthday was that she would continue to receive all trust income even after daughter became 21. She also testified that Mr. Rankin advised her that he had conveyed his opinion to the trustee. There is no other evidence, documentary or testimonial, that either of those events, in fact, occurred. Mother discussed Mr. Rankin's opinion with daughter, who accepted it without question. Mother acknowledged that she was aware of her daughter's acceptance of, and reliance on, what she told her.

[332]

Daughter attained age 21 on February 6, 1962, and mother continued to receive all of the trust income payments. The trustee's records show that it took no action, other than to make the name changes mentioned above, and made no inquiries with respect to the trust provision in question. It is conceded that the trustee did not follow its normal operating procedures of calendaring a "tickler" memorandum as a reminder to check the file prior to the daughter's 21st birthday, nor did it ever obtain a legal opinion or seek court guidance as to the effect of the mother's marriage and divorce on the daughter's right to income payments when she became 21.

It was not until March, 1976, that daughter was given a copy of the trust instrument by mother's attorney when daughter agreed to dismiss proceedings to have herself appointed guardian of her mother.[2] Shortly after receiving a copy of the agreement, daughter, on September 3, 1976, through her attorney, made demand upon the trustee for one-half of the trust distributions, retroactive to February 6, 1962. The bank filed the present suit for declaratory judgment in November, 1976.

The trial court construed the third paragraph of Article X to mean that in order for the daughter to be entitled to receive one-half of the trust income, her mother had to be married at the time the daughter attained age 21. The trial judge concluded, therefore, that because mother divorced her second husband while daughter was still a minor, daughter was not entitled to one-half of the trust income. We agree.

If there were but one sensible interpretation of the provision, there would be nothing to construe (*see Raymond v. Lillegard,* 35 Or App 225, 580 P2d 1078 (1978)), but such is not the case. All the parties agree that two conditions at least had to occur before daughter would receive one-half of the income: Mother

---

[2] The proceedings were subsequently dismissed.

must have married and daughter must have attained the age of 21. Also, they agree that in the event the mother married before daughter became 21, mother was entitled to receive the entire income until daughter became 21. Further, if mother had married after daughter's 21st birthday, daughter would be entitled immediately to begin to receive one-half the income. It is conceded that if mother had divorced her second husband the day after daughter became 21, that divorce would not have disentitled daughter to receive one-half of the trust income and revested mother's income interest. That much is clear, but there *is* an ambiguity in the trust instrument as to whether the termination of the Jaffe marriage before the second happening which would divest part of mother's income interest is relevant in determining whether the stated condition of "remarriage" was fulfilled.

■ The word "remarriage" carries two connotations. It may mean the act of marrying after having previously been married; it may mean the status of being married after having previously been married. *See, e.g., Peters v. Briggs & Sons,* 10 Or App 310, 499 P2d 1361 (1972); *Minder v. Minder,* 83 NJ Super 159, 199 A2d 69 (1964); *Lehmann v. Lehmann,* 225 Ill App 513 (1922); *Peters v. Peters,* 214 NW2d 151 (Iowa 1974). In the present situation there is nothing to compel either reading of the word in the provision standing by itself. So, as did the trial judge, we first look to "the four corners" of the trust agreement to determine whether we can glean the settlor's intent. *Morse v. Macrum,* 22 Or 229, 233, 29 P 615, 30 P 73 (1892); *Fields v. Fields,* 139 Or 41, 45, 3 P2d 771, 7 P2d 975 (1932); *Unander v. U.S. National Bank,* 224 Or 144, 153, 355 P2d 729 (1960).

We draw the following from the trust instrument:

1. When the trust was executed Mr. Duling lived near the rural community of Terrebonne, but in Crook County; he was married and had one child, a daughter.

[334]

2. The initial trust corpus consisted of several life insurance policies, totalling a substantial amount in face value in 1948 dollars.

3. The instrument was designed to enable the settlor to have as much of his testamentary estate pass to it as he might desire.

4. He was concerned to provide a secured income to wife in the first instance, and all of the income was to be hers at least until daughter reached 21, even if she entered into a new marriage and even if through a division of income to daughter on the occurrence of marriage could have resulted in advantages *(e.g.,* income taxes) without endangering daughter's support.[3]

5. He demonstrated a substantial degree of confidence in wife by expressing his desire that as to any business interests and farm land that should come into the trust the trustee be "guided relative to the management and operation *** by the judgment of the trustor's wife ***."

6. He was concerned with the welfare of daughter as a minor and with wife's "station in life," and he therefore provided for a limited power to invade principal.

7. He intended to provide at least one-half the income to his wife for her lifetime in all events.

8. He intended, in the event the divesting events never occurred, that wife have all the income for life

---

[3] The trust instrument was executed in June, 1948. Congress created the estate tax marital deduction (now IRC §2056) in the Revenue Act of 1948 (P.L. 471, 80th Cong., Second Session) on April 2, 1948, applicable to estates of persons dying after December 31, 1947. *See* 1948-1 C.B. 304-306. Nothing in the record bears on the impact of the new deduction on the drafting of either the trust or the will.

even after daughter was no longer being supported by her.[4]

9. The happening of a marriage and a divorce during daughter's minority was not provided for either expressly or by necessary implication.

From the trust instrument itself we cannot reasonably draw an inference that the settlor had any specific intention as to how his trustee should apply the income in the present situation. It seems that the possibility of wife's marriage and divorce simply never occurred to him. If we turn to the "extrinsic evidence" that was offered, we get no help at all. It would serve no purpose to review that evidence in detail here, for the sum and substance was that neither the trustor nor the scrivener ever considered the possibility of the situation arising.[5]

3. Nonetheless, we must assign some meaning to the provision, for it is an integral part of the dispositive scheme. Not being able to divine a certain intention when none in fact existed, we must adopt a construction which is most consistent with the overall intention discerned from the other provisions of the trust instrument. *Pioneer Trust Co. v. Thielsen,* 199 Or 206, 258 P2d 788 (1953). That process leads us to conclude that Mr. Duling's overriding intention was to provide security for his wife, depending upon her to take care of their child during her minority. If when that minority ended, and if wife was married and would not therefore be solely dependent on the trust and her own property for her livelihood, then the daughter was to begin to receive an assured share without the possible

---

[4] No special provision was made for the event of wife's death during daughter's minority. The second paragraph of Article X simply specifies the income payments to daughter if mother died before daughter reached 40. Similarly, his contemporary will contains no reference to a guardian for the daughter.

[5] Error is assigned to the admission of testimony by the scrivener, the trustor's attorney, about what the trustor intended by the provision. We need not decide the issue. The trial judge did not consider the testimony in arriving at his judgment, and we find it of no assistance except to the extent that it merely confirms our conclusion that neither the settlor nor his attorney ever thought about the problem.

intervention of wife's husband. Absent the existence of that situation, wife was to be the sole direct beneficiary for her life or until she married after the daughter's attaining her majority. In short, we reach the same conclusion that the trial judge reached.[6]

Affirmed.

**BUTTLER, J.,** dissenting.

It bears repeating that hard cases make bad law.

The only thing that makes this case a hard one is the negligence of the trustee over a 14-year period, not the language of the trust instrument, which is clear and unambiguous. If the majority opinion stands, there will result an untold amount of mischief with respect to other trust or testamentary instruments which use the same, not uncommon phrase: "In the event of the remarriage of my wife * * *." Undoubtedly, there will be some surprises to the parties involved when a court decides (as did the trial court here) that the phrase does not mean the act or event of remarrying, but means, in addition, that the remarriage must be sufficiently durable to last until an additional event occurs or (as the majority does here), that the remarriage must take place after that other event occurs.

It is curious, indeed, that while this court and the trial court reach the same result, the latter found it necessary to add language to, and the former finds it necessary to delete a word from, the trust provision. It is also curious that none of the parties argued for the construction adopted by the majority—perhaps because they, like I, have never heard of the rule of "construction by deletion."

---

[6] The dissent waxes wroth over a purported excision by the majority of the word "and" from the contested provision. The emotion is passing strange, for it was precisely the presence of that word that caused the author of this opinion to recognize the ambiguity and to appreciate the trial court's analysis as being correct.

[337]

The majority's conclusion is that " * * * wife was to be the sole direct beneficiary for her life or until she married after the daughter's attaining her majority." (39 Or App at 337). The trust language, however, is:

> "In the event of the remarriage of the trustor's wife *and* after the trustor's daughter shall have attained the age of twenty-one (21) years * * *." (Emphasis supplied.)

It is necessary to excise the word "and" before the language says what the majority says it means. But if that word were not there, this case would not be here: clearly the mother did not remarry after the daughter became 21.

I would neither add to, nor delete from, the language used by the trustor, and would hold that it means exactly what it says: (1) if the wife remarries, and (2) the daughter attains age 21, daughter is entitled to one-half of the trust income. There is no requirement that the two events must occur in any particular sequence, or that the remarriage be of any particular duration or quality. Whether the remarriage terminated by divorce or by death of the new husband, or when it terminated, is of no consequence. The first condition is that the event of remarriage take place. It did.

Apparently the majority concludes that the word "remarriage" means one thing before the daughter became 21, and another thing thereafter. The majority concedes, as do the parties, that the mother's remarriage after the daughter became 21, would entitle the daughter to one-half the income immediately, regardless of the quality or duration of the remarriage. In other words, the *event* of remarriage is the significant occurrence. However, by some form of sleight-of-hand, the majority says the event of remarriage before the daughter attains age 21 does not count unless the marriage lasts until daughter becomes 21. By giving the word two different meanings in the context of the

[338]

same trust provision, the majority "discovers" an ambiguity.

It is interesting, however, that in resolving this self-generated "ambiguity," the majority does not rely on either meaning of the word "remarriage," but simplifies the problem by excising the word "and" from the trustor's language. That excision, however, precludes what the majority previously conceded would be the result had the mother remarried before the daughter became 21, but obtained a divorce thereafter.

The majority purports to "look to 'the four corners' of the trust agreement to determine whether we can glean the settlor's intent." 39 Or App 334. It then lists nine observations, from which it concludes candidly that it gets no help. Nor is there any help from the "extrinsic evidence." What, then? The majority tells us: "Nonetheless, we must assign some meaning to the provision * * *." 39 Or App at 336. The opinion then does just that: it *assigns* a meaning by deleting, *sub silentio,* the word "and" from the trustor's language, as I explained at the outset.

Assuming, *arguendo*, that it is necessary to construe the provision by looking to the "four corners," then we should look at all that lies therein. In doing so, there are some observations either ignored or overlooked by the majority.

1. The trustor does not give the corpus of the trust to the mother under any circumstances; it goes to the daughter.

2. The power to invade the corpus is extremely limited—no more than $2,400 per year—and then only after having "due regard to the trustor's minor daughter, Carol Duling, the trustor's wife's station in life, other income the trustor's wife may have from her separate property * * *."

[339]

3. While the trust was the principal testamentary instrument of Kenneth Duling (his will poured over into the trust) he did not give his wife a general power of appointment in the trust assets which would have qualified her interest in the trust for the marital deduction under the Federal Estate Tax as it existed then. This fact tells me that either he did not want his wife to have that much control over her interest, that is, he wanted to be certain the trust assets went to his daughter, or that his wife's individual assets were sufficiently large that it would be preferable, from the estate tax standpoint, not to add additional assets to her estate on her death. If the latter were the case, he had no reason to be so concerned for her economic well-being. But, in either case, the inference is that he was at least as concerned for his daughter's financial welfare and that it was not his "overriding intention" to provide security for his wife, as the majority concludes. Once she remarried, the daughter was to receive one-half his income when she became 21.

I conclude, however, that there is no ambiguity in the trust provision, so the majority's exercise in attempting to interpret it is for naught. There is nothing in the provision which leads me to conclude that the word "remarriage" carries a meaning other than its ordinary one: the act of marrying and not the status existing thereafter. *Minder v. Minder,* 83 NJ Super 159, 199 A2d 69, 73 (1964); *Lehmann v. Lehmann,* 225 Ill App 513, (1922). The trustor, himself, characterized it as an "event." Once the wife remarried, "the event of remarriage" occurred, and that condition was satisfied. Thereafter, when daughter became 21, the second condition was fulfilled, and she was entitled to one-half of the income.

Having concluded that the daughter was entitled to receive one-half of the trust income commencing February 6, 1962, it remains to be decided who is liable to her for the payments, and whether she is barred from recovering by reason of the lapse of time.

[340]

As a general proposition trust funds, both income and principal, must be paid out and distributed in accordance with the provisions of the trust agreement, and that the trustee has a duty to deal impartially as among several beneficiaries, 2 Scott, Trusts, §183 (3d ed 1967). The duty of a trustee to its beneficiaries is "a heavy one," *Cloud v. U. S. National Bank,* 280 Or 83, 90, 570 P2d 350 (1977), and the trustee is liable if he pays trust monies to one who is not entitled to them.

The last proposition is amplified in Comment (b) to The Restatement (Second) of Trusts § 226 (1959), in which it is stated:

"The trustee is liable although he makes the payment or conveyance under a reasonable mistake of law or of fact. If he is in doubt as to the proper person to whom a payment or conveyance should be made, he can apply to the court for instructions and will be protected by the order of the court against claims of all persons who were made parties to the proceeding.

"The trustee is liable although he reasonably believes that the person to whom he pays or conveys is the beneficiary or that the payment or conveyance is authorized or directed * * * by the terms of the trust." Restatement (Second) of Trusts, *supra* at 524.

Superimposed over that section is § 201,[1] which states that a violation by the trustee of any duty owed to a beneficiary constitutes a breach of trust.

---

[1] "§ 201. What Constitutes a Breach of Trust

"A breach of trust is a violation by the trustee of any duty which as trustee he owes to the beneficiary.

"* * * * *

"b. *Mistake of law as to existence of duties and powers.* A trustee commits a breach of trust not only where he violates a duty in bad faith, or intentionally although in good faith, or negligently, but also where he violates a duty because of mistake as to the extent of his duties and powers. This is true not only where his mistake is in regard to a rule of law, whether a statutory or common-law rule, but also where he interprets the trust instrument as authorizing him to do acts which the court determines he is not authorized by the instrument to do. In such a case, he is not protected from liability merely because he

It is not necessary to decide here whether the trustee's liability for mispayment of the income is absolute, because even if that liability were predicated on the failure to measure up to the prudent man standard, it would not help the trustee in this case. This is not a case where the trustee, pursuant to its standard procedures, made reasonable inquiry shortly before the daughter's 21st birthday, but was given erroneous facts on which it could reasonably rely, and on the basis of which there was no doubt as to whom the income was payable.

Rather, this is a case where: (1) the trustee was given the material facts by the mother voluntarily prior to the initial date when the problem would arise; (2) the information so provided raised a serious question as to whether the daughter would be entitled to one-half of the trust income when she became 21; (3) the trustee took no action at that time to resolve the doubt; (4) the trustee did not follow its standard operating procedures designed to trigger an automatic review of the file prior to a critical date, and (5) the trustee failed to take any action when the problem was called to its attention in 1970.

It is clear that the trustee decided to resolve the doubt as to whom the income was payable after the daughter became 21 and in doing so, it assumed the liability of error.[2] Clearly, it could have, and should

---

acts in good faith, nor is he protected merely because he relies upon the advice of counsel. * * * If he is in doubt as to the interpretation of the instrument, he can protect himself by obtaining instructions from the court. The extent of his duties and powers is determined by the trust instrument and the rules of law which are applicable, and not by his own interpretation of the instrument or his own belief as to the rules of law." Restatement (Second) of Trusts 442, §201 (1959).

[2] *See Rodgers v. Herron,* 226 SC 317, 85 SE2d 104 (1954), 48 ALR2d 1241 (1956), where it was held that a trustee who undertakes to resolve a doubt as to whom trust income is payable without the aid of a court is negligent as a matter law.

have, sought a court determination, ORS 28.040,[3] but did not do so until 14 years after it knew, or in the exercise of reasonable care should have known, of the existence of a problem.

Accordingly, I would hold that the trustee is liable to the daughter for one-half of the trust income commencing February 6, 1962, plus interest thereon, unless daughter is barred by the lapse of time from asserting her claim.

### LAPSE OF TIME: DAUGHTER-TRUSTEE

The breach of trust with respect to the daughter occurred when she became 21 in 1962; no claim was made against the trustee until after daughter obtained a copy of the trust agreement in 1976. The lapse of time is urged by the Trustee as a bar to the daughter's claim.

While it is true that "a beneficiary may be barred by his laches from holding the trustee liable for breach of trust," *Lulay v. Lulay,* 247 Or 497, 501, 429 P2d 802 (1967), it is also true that the one asserting the bar has the burden of proving the elements of laches:

"'In order to constitute laches there must have been full knowledge of all the facts, concurring with a delay for an unreasonable length of time, and laches does not start to run until such knowledge is shown to exist. * * * In addition, the delay must result in substantial prejudice to the defendant to the extent that it would be inequitable to afford the relief

---

[3] ORS 28.040 provides:

"Any person interested as or through an executor, administrator, trustee, guardian or other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust, in the administration of a trust, or of the estate of a decedent, ward or insolvent, may have a declaration of rights or legal relations in respect thereto:

"(1) To ascertain any class of creditors, devisees, legatees, heirs, next of kin or other; or

"(2) To direct the executors, administrators, trustees, guardians or conservators to do or abstain from doing any particular act in their fiduciary capacity; or

"(3) To determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings."

[343]

sought against the party asserting laches as a defense. * * * Thus, the doctrine of laches is not an inflexible rule, but its application depends upon the particular circumstances of each case. * * *' " (Citations omitted.) *Albino v. Albino,* 279 Or 537, 552, 568 P2d 1344 (1977).

I cannot say that the record shows that the daughter had "full knowledge of all of the facts" prior to 1976 when she actually received a copy of the trust agreement. The trustee, however, emphasizes its meeting with daughter in 1970, contending that as a result of that meeting she knew everything she had to know to assert a claim to one-half of the trust income. In so contending, the trustee ignores the fact that the purpose of that meeting was to determine whether daughter could obtain additional money under another trust established by her father for her, not to discuss the trust agreement here involved. Further, when it was determined that she could not do so, the trust officer referred to the instant trust agreement and read her a portion of paragraph 3 of Article X of that agreement, but did not show it to her. In response to that reading of the language, the daughter mentioned her mother's remarriage and divorce. While the record is not explicit on the point, the only reasonable inference to be drawn therefrom is that the daughter was advised she was not entitled to any of the income.

Some observations concerning that 1970 meeting are in order. First, it was apparent to the trustee that the daughter did not have a copy of the trust agreement, and yet no copy was given to her. The trust officer, by way of justification, testified that she did not request one. While it may be true that a trustee is not obligated to furnish a beneficiary certain information in the absence of a request, Restatement (Second) of Trusts § 173 (1959), it is clear that the beneficiary is entitled to a copy of the trust agreement. As stated in Comment (c) to § 173, *supra,* the beneficiary "is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to

[344]

prevent or redress a breach of trust." The most fundamental information is the trust agreement, without which the beneficiary cannot seek advice. Accordingly, the trustee was under an affirmative duty to provide the daughter with a copy of the trust agreement when it realized that she did not have one.

Second, it is clear that the daughter's mention of her mother's remarriage and divorce at the time of the 1970 meeting raised a question in the mind of the trust officer which caused him to consult his superior in the trust department. However, the existence of any doubt as to the daughter's rights was not conveyed by the trustee to the daughter—in fact, she left the meeting with the advice that she was not entitled to any money at that time. The trustee had a duty to communicate its concern, which was a material fact, to the daughter so that she could seek independent counsel as to her rights. In the absence of such communication from the trustee, the daughter had the right to rely upon the trustee's having fulfilled its obligation to protect her interests and to assume that she had no right to one-half of the trust income.

The trustee goes on to point out the general rule that while courts sitting in equity are not strictly governed by statutes of limitation applicable to comparable actions at law, those statutes, by analogy, are generally used as a yardstick in applying laches. It also argues that when a claim is asserted after the expiration of the time allowed to bring a corresponding action at law, the beneficiary has the burden of "explaining" the prolonged delay. *Allied Vet. Council v. Klamath Co.,* 23 Or App 653, 544 P2d 190 (1975). Because, the trustee contends, the six-year statute of limitations would be applicable if this were an action at law, the daughter's claim was not asserted for more than six years after the 1970 meeting.

Even assuming that the daughter had full knowledge of all of the facts after the 1970 meeting with the trustee, daughter's claim against the trustee is not one

[345]

for money had and received, as the trustee contends, but is a claim for breach of a trust agreement, which in this case is a sealed instrument entered into before August 13, 1965, and under ORS 12.070[4] must be commenced within 10 years. Therefore, the burden was not on the daughter to explain the delay.

Accordingly, I would hold that the daughter's claim against the trustee is not barred by laches.

## MOTHER'S LIABILITY TO DAUGHTER

The daughter also contends that her mother is liable to her in an amount equal to one-half of all trust funds distributed to mother since February 6, 1962, plus interest, for money had and received, and also argues for the imposition of a constructive trust for the same amount.

Assuming, *arguendo,* that the daughter has a valid claim for money had and received against her mother, there is no evidence showing that the funds erroneously received by the mother are identifiable such that they may constitute the *res* of a constructive trust. Therefore the most that the daughter would be entitled to is a money judgment against her mother.

Additionally, while a claim for money had and received is an action at law, it is governed by equitable principles. *Smith v. Rubel,* 140 Or 422, 13 P2d 1078 (1932). Accordingly, under this "mixed bag" remedy for restitution, the mother is liable to the daughter *unless* the mother has so changed her position that it would be inequitable to compel repayment. 3 Scott, Trusts 2186, § 254.1; Restatement (Second) of Trusts § 254 (1959).[5] Among the circumstances to be considered

---

[4] ORS 12.070 provides:

"(1) An action upon a judgment or decree of any court of the United States, or of any state or territory within the United States; or

"(2) An action upon a sealed instrument entered into before August 13, 1965, shall be commenced within 10 years."

[5] *See* Restatement (Second) of Trusts 637-38 §254 (1959):

"If the trustee has made a payment out of trust property to one of several beneficiaries to which the beneficiary was not entitled, such

in determining whether it is inequitable to compel the beneficiary to make restitution are the disposition of the money by the beneficiary, the amount of overpayment and the time which has lapsed.

While the record is sparse with respect to the disposition the mother has made of the money, she testified that the "primary source of her support" since 1960 has been the trust income.[6] A reasonable inference from that testimony is that she used all of that income, plus other money, for her support. If that be true, that circumstance alone would relegate strongly against requiring repayment, although the existence of other assets owned by the mother (not disclosed by the record) might change the result.

The latter two considerations mentioned above require a discussion of laches in a different context from that applicable to the claim against the trustee. The analogous period of limitations applicable to the quasi-contractual claim against the mother is six years, ORS 12.080, which would start to run from the date of each overpayment received by the mother. Since the record does not indicate that the mother knew that she was not entitled to the income or that she acted other than in good faith in reliance on the opinion of her attorney, there is no reason to permit recovery, if at all, for more than six years prior to the assertion of this claim by the daughter. Even if the claim is so restricted, the amount of money is large

beneficiary is personally liable for the amount of such overpayment, and his beneficial interest is subject to a charge for the repayment thereof, unless he has so changed his position that it is inequitable to compel him to make repayment."

*See also* 3 Scott, Trusts 2188, §254.2 (3d ed 1967).

[6] There was an objection to the question eliciting this evidence, the question was answered, and then the objection sustained, in our view erroneously. On *de novo* review, we may consider the evidence, although it was not admitted. *See Waterway Terminals v. P. S. Lord,* 256 Or 361, 375-76, 474 P2d 309 (1970). The better practice, however, is for the party affirming the rejected evidence to make a complete record by offering it "under the rule."

and the lapse of time is substantial. On the other hand, there is no reason to restrict any claim the daughter might have to less than six years because there is no evidence that daughter had knowledge of all of the facts until she obtained a copy of the trust agreement in 1976.

At least, then, daughter's claim against her mother would be substantially less effective than her claim against the trustee. Accordingly, I will not pursue its resolution further.

## TRUSTEE'S RIGHTS AGAINST MOTHER

The question remains whether, as the trustee contends, it is entitled to recover from the mother if it is held liable to daughter. Having held that the trustee is liable, and since the trustee is solvent, we treat the case as if the trustee has made good the loss to daughter and is seeking restitution for its own account rather than for another beneficiary. *See* 3 Scott, Trusts 2190, § 254.2 (3d ed 1967).

There is no contention that the trustee acted in bad faith or dishonestly, but only that it made a mistake of law, and did so negligently. However, payments made under a mistake of law are not recoverable. *First Nat'l Bank v. Noble et al.,* 179 Or 26, 57, 168 P2d 354 (1946), 146 ALR 1426 (1947). Restatement, Restitution, § 45 (1937).

## ATTORNEY'S FEES AND COSTS IN TRIAL COURT

The trial court, having found in favor of the trustee and mother, awarded each of them attorney's fees, expenses and costs to be paid out of the trust corpus, and also allowed the trustee "reasonable compensation for extraordinary services in connection with this litigation" payable out of the corpus. Daughter contends none of those awards was proper, but does not contest the amounts awarded if otherwise appropriate.

If the trustee had sought court guidance in 1962, when it should have done so, it would have been

entitled to reimbursement for expenses out of the corpus of the trust, Restatement (Second) of Trusts § 244 (1959), and so would both of the beneficiaries. *Gorger v. Gorger,* 276 Or 267, 555 P2d 1 (1976). The proceeding would have been for the benefit of the trust, but there would have been only one issue—a legal one relating to the construction of the trust provision--and all of the related expenses would have been less. In addition, the trustee would have been a neutral fiduciary seeking guidance.

It is apparent that the present proceedings are not quite the same. While the suit was necessary in the administration of the trust, the trustee is no longer a neutral—it is an advocate of a given construction because of its own exposure to liability, and it is an adversary to one of the beneficiaries; it has a substantial financial stake in the outcome. Further, the delay in bringing the suit has complicated the issues and increased the expenses incurred in this litigation. The extraordinary services rendered by the trustee are largely the result of its own negligence.

For the foregoing reasons, I conclude that the trustee should not be awarded any compensation for extraordinary services. While the trust agreement authorizes the trustee to pay itself compensation out of the principal or income of the trust, including compensation for extraordinary services (including those involved in litigation), the failure of the trustee to resolve the problem in 1962 was a breach of trust. The general rule is that a trustee who is faithful to his trust is entitled to compensation out of the trust estate, *Wood et al. v. Honeyman et al.,* 178 Or 484, 555, 169 P2d 131 (1946); where the trustee has breached the trust, it is discretionary whether to deny him all compensation, or allow reduced compensation. Restatement (Second) of Trusts § 243 (1959).

Notwithstanding my conclusion that the trustee be denied compensation for extraordinary services, I think the trustee is entitled to reimbursement from

the trust corpus attorney's fees, costs and expenses it would have incurred if it had commenced proceedings in 1962. Obviously, no accurate amounts therefor are available, but it would be equitable to award one-half of the attorney's fees the trial court found reasonable, plus statutory costs and other reasonable expenses relating to deposition and transcripts.

With respect to the award to the mother, I find no error. It was not up to her to do anything in 1962, and while her expenses undoubtedly were greater in this suit than they would have been in a more simple 1962 suit, the delay was not her doing. The award to her should be affirmed.

No error is assigned to the failure of the trial court to award attorney's fees and costs to daughter.

Accordingly, I would reverse the judgment and decree of the trial court, and remand the proceedings for a determination of the amounts owed by trustee to daughter, with interest from the date of mispayment to mother, and for the entry of a judgment in favor of daughter against the trustee in those amounts.