IN THE OREGON TAX COURT

RIGAS MAJA, INC.,
an Oregon nonprofit corporation
*v.*
DEPARTMENT OF REVENUE
(TC 3300)

Daniel H. Skerritt, Ater Wynne Hewitt Dodson & Skerritt, Portland, represented plaintiff.

Ted E. Barbera, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered June 21, 1993.

### CARL N. BYERS, Judge.

Plaintiff appeals from the denial of a property tax exemption for 1990. Since plaintiff seeks exemption under ORS 307.130[1] as a charitable organization, it is necessary to consider the organization as well as its activities.

---

[1] ORS 307.130(1)(a) states:

"(1)  Upon compliance with ORS 307.162, the following property owned or being purchased by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

Plaintiff is an Oregon nonprofit corporation organized in February, 1990. Its purpose is to establish and operate an adult foster care facility. Most of the individuals involved are members of the Oregon Latvian Evangelical Lutheran Congregation, a small church serving the Latvian community, or have ties to the Latvian community. Plaintiff's intent is to provide a facility for the elderly in need of assisted care in a familiar cultural context. The building involved, formerly the parsonage for the church, is close to the church and the Latvian community center. The caretakers speak Latvian and are familiar with Latvian customs. It appears the meals provided and the atmosphere in the home are Latvian. Adult foster care for the elderly often involves assistance in eating, bathing, dressing and other aspects of living. If elderly Latvians can be assisted by people familiar with their customs, language and feelings, as opposed to strangers speaking a "foreign" tongue and observing unfamiliar customs, it can be of great comfort to them.

The subject property is a two-story residence. The first floor contains four bedrooms, a living room, dining room, and presumably one or more bathrooms. Since one bedroom can be shared, the floor can accommodate five adults. The second floor also contains four bedrooms and is used by the caretaker and the caretaker's family.[2] The caretaker provides the needed 24-hour on-site presence and supervision.

Plaintiff leased the property from the church for $600 per month beginning April 1, 1990.[3] Witnesses for plaintiff testified that this is substantially below market rates. Plaintiff obtained donations of money, materials and volunteer labor to remodel the property. This was necessary to bring it up to code requirements for adult foster care facilities. Plaintiff estimates over 1,200 hours of volunteer

---

"(a) Except as provided in ORS 748.414, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

[2] Presumably it also contains a bathroom, kitchen and living areas.

[3] ORS 307.112 provides for the exemption of property leased by one exempt organization to another exempt organization.

labor were used. In addition to cash and building materials, there was also furniture and other items donated.

Plaintiff applied for exemption for federal income tax under IRC § 501(c)(3) as a charitable organization. That exemption was granted. Plaintiff also applied for property tax exemption as a charitable organization. The Multnomah County assessor's office denied the application. It appears the two main grounds for denial were: (1) discrimination (the assessor believed the home was open only to Latvians); and (2) no charity (assessor concluded plaintiff was charging market rates). Defendant upheld the denial and plaintiff appealed to this court.

## DISCRIMINATION

The assessor apparently believed that if the benefits of the facility are limited to members of the Latvian church or community, it would not qualify for the charitable exemption. However, the rule long established in Oregon is:

> "It is not essential to charity that it shall be universal. That an institution limits the dispensation of its blessings to one sex, or to the inhabitants of a particular city or district, or to the membership of a particular religious or secular organization, does not, we think, deprive it either in legal or popular apprehension of the character of a charitable institution." *Benevolent Society v. Kelly*, 28 Or 173, 191, 42 P 3 (1895).

Thus, even if the facility, whether by design or practice, is limited to Latvians, it would not disqualify plaintiff.

Here, the evidence established that the home is not limited to Latvians. Plaintiff characterized the result as one of "self-selection." That is, because the Latvian culture dominates in the facility, non-Latvians do not feel comfortable there. Even so, the first resident was a Polish, Catholic woman who spoke Latvian. The court finds that plaintiff does not discriminate against non-Latvians. Although publicity is by word-of-mouth in the Latvian community and notices in the Latvian newspaper, neither plaintiff's policies nor its practices exclude non-Latvians from becoming residents.

Plaintiff's policies and practices are not as restrictive as found in *German Apost. Christ. Church v. Dept. of Rev.*, 279 Or 637, 569 P2d 596 (1977), where the residents were limited to members of that church. There the court found

that the primary purpose of the organization was to benefit those in need and not merely a self-regarding purpose.

■ Here, the members of the Latvian church and community involved are not merely forming a cooperative to provide for their own care, such as in *Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 360 P2d 293 (1961), or providing insurance for themselves as in *Ore. Physicians' Serv. v. State Tax Com.*, 220 Or 487, 349 P2d 831 (1960). Rather, those with ties to the Latvian community, for altruistic reasons, have worked to provide a facility for elderly Latvians. Although the objects of plaintiff's charity may not be identified with as much specificity as might be desired, the court is persuaded that they are legitimate objects of charity.[4] They are not able or are in a financial position to provide for themselves the kind and quality of care provided by plaintiff. The court considers the comfort provided the elderly in the form of their traditional language and culture a significant factor.

## ELEMENT OF GIVING

■ It is essential to charity that there be an element of gift or giving. *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 817 P2d 1292 (1991). Defendant maintains that plaintiff's rates of $900 to $1,050 per month constitute market rates and, therefore, there is no gift. The assessor's market survey showed that the market rates range from $900 to $1,500 per month.

Plaintiff's expert witness owns and operates an elder care referral service. Her testimony was consistent with the market survey of the assessor's office. That is, she testified that in 1991 the typical rates were $1,050 for a shared room and $1,300 to $1,600 for a private room, depending upon the level of care involved. The rates would have been slightly less in 1990. However, she also testified that the cost varied with the level of care required. The evidence showed that plaintiff's charges do not vary. Once established, plaintiff provides whatsoever care it can without any additional charge. Of course, if the level of care rises to the point where it exceeds

---

[4] *See, for example, Pape et al v. Title and Trust Co.*, 187 Or 175, 210 P2d 490 (1949), where the court found that the establishment of a building for "homeless, self-supporting women" was not charity.

plaintiff's ability, the resident would have to move to a nursing home.

This witness testified that in her opinion plaintiff's rates were less than the market. Another witness testified that none of the current occupants were on public assistance or received food stamps. However, they would require public assistance or food stamps if in a for-profit facility. This witness stated that one occupant was unable to pay more than $600 per month and plaintiff had accepted her.

Like all charitable organizations, plaintiff has limited resources. It can give to the extent of those resources, but it cannot exceed them. The court finds the requisite giving is present in plaintiff's operations.

The court finds plaintiff conducts an assisted-care facility for elderly Latvians. Although plaintiff received limited donations of cash and materials, it has applied those donations and substantial volunteer labor in providing the services involved. Accordingly, the court finds plaintiff is a charitable organization within the meaning of ORS 307.130; its property is exclusively used in furtherance of its charitable purposes and is exempt from property taxation. Plaintiff to recover costs and disbursements.