DECISION
Plaintiff appeals the denial of a property tax exemption for property identified as Account 1507605 (subject property) for the 2010-11 tax year. A telephone trial was held on July 7, 2011. David E. Carmichael, Attorney at Law, appeared on behalf of Plaintiff. Marc Kardell, Assistant County Counsel, appeared on behalf of Defendant. Louise A. Shimmel (Shimmel), Executive Director of the Cascade Raptor Center, testified on behalf of Plaintiff. Plaintiff's Exhibit 1 was received without objection. Defendant's Exhibits A through G were received without objection. At the close of trial, the record was left open for additional submissions. Plaintiff submitted Rebuttal Exhibit 1. Defendant responded in a letter stating that Defendant "does not desire to object" to Plaintiff's Rebuttal Exhibit 1, provided that the court accept Defendant's letter as its cross examination. (Def's Ltr at 1, July 8, 2011.) The record closed on July 8, 2011.
 I. STATEMENT OF FACTS
Plaintiff, a nonprofit corporation, has been incorporated in Oregon since 1990 and has been recognized by the Internal Revenue Service as an organization exempt from Federal income tax since 1992. (Ptf's Ex 1 at 2, 7.) Plaintiff operates a nature education and wildlife rehabilitation facility in Eugene, Oregon, which is located in Lane County. The subject property includes a visitor center, gift shop, caretaker's quarters, education pavilion, clinic, outside ward, *Page 2 
food-breeding barn, two office cottages, three storage sheds, and 50 bird enclosures. (Def's Ex G at 1.) Plaintiff specializes in birds of prey (raptors); "it rescues and rehabilitates sick, injured or orphaned birds with the goal of returning them to the wild." (Id.) Plaintiff uses non-releasable birds as "ambassadors" in education and community outreach programs. (Id.)
A caretaker is on-call at all times for security, answering incoming calls regarding injured birds, admission of injured birds after-hours, and overnight care of injured birds that are already housed at the subject property. (Id. at 2.) Ten bird enclosures are used for rehabilitation and are separated from the public to limit human interactions and reduce stress on the birds. (Id.) The other 40 enclosures house educational birds, which are on display at the subject property, visit schools and public events, and participate in on-site programs. (Id.) Those public enclosures include signs with general information about the bird species along with an individualized history of how each bird was injured and why the bird is not releasable. (Id.) Shimmel testified that, at the time of trial, Plaintiff had 60 birds in public enclosures and 51 birds in the hospital.
Plaintiff responds to phone calls and emails about injured birds 24 hours a day, 365 days a year. (Id. at 3.) Plaintiff provides that service at no charge. (Id.) Plaintiff's educational literature is available in print and electronically at no charge. (Id.) Community members can bring birds in at any time of day or night and volunteers are able pick up birds off-site if other transportation is not available. (Id.) Plaintiff charges no fees for bird rehabilitation. (Id.) Plaintiff operates with three paid staff members and over 100 volunteers who donate over 20,000 hours each year. (Id. at 2.) Plaintiff does not require volunteers to possess any special education or qualifications and invites volunteers to bring friends and family to visit the center at no charge. (Id. at 3.) *Page 3 
Plaintiff charges an admission fee for members of the public to visit the subject property and see the birds.[1]
In 2009, Plaintiffs revenues totaled $292,936 and Plaintiffs expenses totaled $271,649. (Ptf's Ex 1 at 32-33.) Admission fees provided $36,704 in revenue in 2009, which was 12.5 percent of the total revenue. (Ptf's Ex 1 at 32.) The admission fees cover the cost of food and medication for the birds, which totaled $34,335 in 2009, 12.6 percent of Plaintiff s total expenses. (Ptf's Ex 1 at 33; Def's Ex G at 3.) Shimmel testified that Plaintiff has honored requests for discounted admissions but that Plaintiff did not have an explicit policy in place in 2010 allowing discounted admissions based on ability to pay.
Plaintiff has a membership program through which donors pay an annual fee and receive free admission to the subject property. (Def's Ex G at 6.) Members also receive free guest passes, invitations to events, 10 percent discount at the gift shop, and electronic and print newsletters. (Id.) Shimmel testified that membership is not required to gain admission to the subject property. Shimmel also testified that Plaintiff tracks how many people enter the subject property for free, but does not track why the admission was free. Shimmel estimated that approximately 10 percent of visitors receiving free admission were members. Admission may be free because the visitor is a member or volunteer, because the visitor has a free guest pass from a member or a volunteer, or because the visitor requested discounted admission. (Def's Ex G at 3.) If a visitor requests discounted admission, Plaintiff may grant the request outright; Plaintiff may provide an envelope for visitors to send in a donation when they have the funds; or Plaintiff may suggest an exchange whereby the visitor receives discounted admission in exchange for a commonly used item or service, such as paper towels or raking leaves. (Id.) *Page 4 
Plaintiff gives free admission passes to groups or individuals who provide a service to Plaintiff. (Id. at 4.) In 2010, Plaintiff distributed over 1,000 passes in that manner. (Id.) Plaintiff also provides free admission passes to others in the community who ask for them, such as businesses, other non-profit organizations, and youth sport groups. (Id.) Although Plaintiff generally charges an admission fee, Plaintiff has traditionally offered one "free day" to the public each year. (Id.) Admission was free on the "free day" for the first 12 years; beginning in 2007, Plaintiff instituted a $1-$3 admission fee because of large and unmanageable crowds. (Id.) The event occurs annually regardless of whether Plaintiff has a sponsor to help cover costs. (Id.)
Plaintiff charges fees for educational programs, both on and off-site. (Id. at 5.) The income from those programs covers approximately half of Plaintiff's cost for an educational program staff member. (Id.) Plaintiff provides scholarships for those programs when funding is available. (Id.) Plaintiff was able to provide scholarships to 300 students in 2010. (Id.) Free educational programs are offered to all visitors on weekends throughout the year, regardless of whether the visitor paid an admission fee or entered the subject property for free. (Id.) Plaintiff offers several free programs to Lane County residents each year at public events and other meetings. (Id.) There may be an admission charge or suggested donation for the event itself, but Plaintiff's presentations and displays are free. (Id.) Plaintiff's staff, volunteers, and raptors (Plaintiff's "avian ambassadors") visit dozens of classrooms each year. (Id. at 6.) Although funding for those programs is not often available, those programs are provided free of charge when funding is available. (Id.) Shimmel testified that Plaintiff also presents "guerilla handler days" during which handlers and a bird make a free public appearance.
At trial, Defendant conceded that Plaintiff's income and expenses are accurate and that all of Plaintiff's income is used for charitable work for the raptors. The remaining point of *Page 5 
contention between the parties is whether Plaintiff satisfies the requirements of OAR 150-307.130-(A)(3)(d)(C).[2] Defendant acknowledges that Plaintiff does not charge a fee to care for the birds. Defendant questions whether Plaintiff's visitors "receive the same treatment irrespective of their ability to pay," and whether Plaintiff charges its visitors a reduced admission fee if they are poor or indigent. OAR 150-307.130-(A)(3)(d)(C)(ii), (iv).
 II. ANALYSIS
Under ORS 307.030, all real property in Oregon is taxable unless specifically exempted. ORS 307.030 states, "(1) All real property within this state * * * except as otherwise provided by law, shall be subject to assessment and taxation in equal and ratable proportion." Plaintiff seeks exemption under ORS 307.130 as a charitable organization. ORS 307.130 provides in relevant part:
 "(2) Upon compliance with ORS 307.162, the following property owned or being purchased by art museums, volunteer fire departments, or incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:
 "(a) Except as provided in ORS 748.414, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."
When looking at statutes granting exemption, the court is guided by the principle that "[t]axation is the rule and exemption from taxation is the exception." Dove Lewis Mem. Emer. Vet.Clinic v. Dept. of Rev. (Dove Lewis),301 Or 423, 426, 723 P2d 320 (1986). Property tax exemption statutes are strictly but reasonably construed. SW OregonPub. Def. Services v. Dept. of Rev. (SW Oregon),312 Or 82, 88-89, 817 P2d 1292 (1991). "Strict but reasonable construction does not require the court to give the narrowest possible meaning to an exemption statute. Rather, it requires an exemption statute be construed reasonably, giving due *Page 6 
consideration to the ordinary meaning of the words of the statute and the legislative intent." North Harbour Corp. v. Dept. ofRev., 16 OTR 91, 95 (2002). Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence."Feves v. Dept. of Revenue, 4 OTR 302, 312 (1971).
Defendant concedes, and the court agrees, that all of the subject property is "actually and exclusively occupied and used" for Plaintiff's charitable work, within the meaning of ORS 307.130(2)(a). The only issue raised by Defendant is whether Plaintiff qualifies for a charitable property exemption given its lack of an explicit policy providing for free or reduced admission based on ability to pay. Essentially, Defendant challenges whether Plaintiff is a "charitable institution" within the meaning of ORS 307.130(2) and OAR 150-307.130-(A). To qualify as a charitable institution, an organization must: "(1) * * * have charity as its primary, if not sole, object; (2) * * * be performing in a manner that furthers its charitable object; and (3) * * * [its] performance must involve a gift or giving." SW Oregon, 312 Or at 89. All three conditions must be met to qualify as a charitable institution within the meaning of ORS 307.130. See Mazamas v. Dept. ofRev., 12 OTR 414, 415 (1993). The test is applied to the overall activities of Plaintiff, not a portion thereof. See Mercy MedicalCenter, Inc. v. Dept. of Rev., 12 OTR 305, 307 (1992).
A. Charitable Object
The first prong of the SW Oregon test requires that Plaintiff have "charity as its primary, if not sole, object." SWOregon, 312 Or at 89. OAR 150-307.130-(A)(3)(b) states that: "The activity conducted by the charitable institution must be for the direct good or benefit of the *Page 7 
public or community at large." OAR 150-307.130-(A)(3)(b). That definition of "charitable" is also found in case law of this court:
 "At one point this court believed that charity was limited to reliving pain, alleviating disease, or removing constraints. * * * Current definitions for purposes of ORS 307.130 are more generous, and find that it is enough that the activity conducted by the charitable institution must be for the direct good or benefit of the public or community at large."
Lebanon Community Found., Inc. v. Linn County Assessor, TC-MD No 011005A, WL 1591920 at *2 (July 18, 2002) (emphasis added) (citations omitted).
In analyzing the first prong, courts look to an organization's purpose, as stated in its articles and bylaws, as prima facie
evidence of the character of the corporation. Samaritan Village,Inc. v. Benton County Assessor (Samaritan Village), TC-MD No 001064C at 8, WL 25846514 (Jan 23, 2003) (citing Dove Lewis,301 Or at 427). Plaintiff's articles of incorporation state its purpose as "(a) the rehabilitation and release of injured, sick, or orphaned wildlife, primarily birds of prey (raptors); and (b) public education designed to enhance awareness, appreciation, respect, and care of the environment and all life forms in it[.]" (Ptf's Ex 1 at 27.) Although not dispositive as to whether Plaintiff fulfills the charitable purpose requirement, Plaintiff's stated purpose weighs in its favor, "tempered with the fact that `[c]harities in this state enjoy no inherent right to exemption from taxation[.]'"Samaritan Village, TC-MC No 001064C at 8 (quotingUnander v. U.S. Nat'l Bank et al,224 Or 144, 151, 355 P2d 729 (1960)).
Courts often turn to the question of gift or giving to determine whether an organization is charitable. Dove Lewis,301 Or at 428. "In determining whether an organization is, by its conduct, charitable, the crucial consideration is the element of a gift or giving." Id. Although "gift or giving" is a separate prong of the three-part SW Oregon test, the analysis often overlaps *Page 8 
with the determination of whether an organization has a charitable purpose. Id. Accordingly, the court notes that Plaintiff's stated purpose in its articles of incorporation weighs in favor of a finding that Plaintiff is a "charitable institution" and turns to the "gift or giving" analysis.
B. Gift or Giving
The element of gift or giving "is what distinguishes charity from nonprofit." Samaritan Village, TC-MD No 001064C at 8. The department's administrative rule cited by Defendant fits into the "gift or giving" analysis, making that the main point of disagreement between the parties in this case. OAR 150-307.130-(A)(3)(d) provides in relevant part:
 "An element of gift and giving must be present in the organization's activity, relating to those it serves. This element of gift and giving is giving something of value to a recipient with no expectation of compensation or remuneration. Often, a charitable organization's product or service is delivered to recipients at no cost or at a price below the market price or price to the organization of the product or service.
 "* * * * *
 "(C) The fact than an organization charges a fee for its services does not necessarily invalidate its claimed status as charitable. It is a factor to be considered in the context of the organization's manner of operation. In determining whether a fee charging operation is charitable, it is relevant to consider the following:
 "(i) Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;
 "(ii) Whether patients or patrons receive the same treatment irrespective of their ability to pay;
 "(iii) Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed;
 "(iv) Whether charges are made to all and, if made, are lesser charges made to the poor or are any charges made to the indigent."
The court in Samaritan Village concluded that the question of whether lesser charges are made to the poor and no charges to the indigent is "a factor within a factor and suggests the application of *Page 9 
a balancing test." TC-MD No 001064C at 11. "[T]he question of whether lesser charges are made falls under the paragraph in the rule addressing fee-charging organizations, which itself is declared to be `a factor to be considered in the context of the organization's manner of operation.'" Id.
(quoting OAR 150-307.130-(A)(3)(d)(C)).
The court in Samaritan Village noted that "the language in paragraph (C) [of OAR 150-307.130-(A)(3)(d)] suggests that an organization that charges for its services is suspect although it is not necessarily a disqualifying factor." TC-MD No 001064C at 8. Shimmel testified that, generally, 14 to 18 percent of visitors to the subject property are admitted for free each year. Shimmel estimated that 10 percent of those visitors were members and, therefore, approximately 12 to 16 percent of non-member visitors received free admission. Shimmel explained that those admission numbers had been kept for internal purposes only and no further breakdown of the admission statistics was available. Shimmel testified that Plaintiff did not have an explicit policy in place in 2010 to charge a reduced admission fee to the poor or offer free admission to the indigent. However, Shimmel testified that Plaintiff offered alternative ways to gain admission if the visitor could not pay, including donating supplies or services. Shimmel testified that some visitors received free admission without contributing services or supplies to Plaintiff, but Shimmel did not have an exact number or estimate of how many people received admission in that manner.
The court has held that "[p]ermitting the poor to work off the price of admission may be good philosophy, but it is not charity."Oregon Country Fair, 10 OTR 200, 206 (1986). Because Plaintiff did not have an explicit policy offering reduced fee or free admission to the poor or indigent, and because Plaintiff could not provide information about how many people / / / *Page 10 
received reduced fee or free admission without providing something to Plaintiff in return, Plaintiff fails to satisfy the factor set out in OAR 150-307.130-(A)(3)(d)(C)(iv).
The question remains whether a failure to satisfy OAR 150-307.130-(A)(3)(d)(C)(iv) is fatal to Plaintiff's request for a charitable property tax exemption. The court in SamaritanVillage concluded that the "practice of insisting everyone pay the established rate is not fatal to the question of whether [Plaintiff] is involved in gift or giving. It does not, however, work in [Plaintiff's] favor." TC-MD No 001064C at 12. Because paragraph (iv) is a "factor within a factor," the court must balance Plaintiff's admission fee policy against other indicators of Plaintiff's gift or giving. Id. at 11. In SamaritanVillage, those indicators consisted of "volunteer services, donations received, and below-market rents." Id. at 9.
Volunteer labor is one factor to consider when examining an organization's gift or giving. The department's administrative rule addressing volunteers states: "The fact that individuals provide volunteer labor to assist the organization in performing its activity may indicate that the organization is charitable. However, it is not a standard in determining whether an organization is charitable per se." OAR 150-307.130-(A)(3)(d)(D). In SamaritanVillage, the plaintiff operated a senior living facility and received 400 hours of volunteer labor each month, the majority of which was provided by the residents of the facility for the benefit of the residents. TC-MD No 001064C at 1, 3. The court concluded that the "volunteer services provided by the residents for their own benefit [was] not charity." Id. at 9. The court cited an example in the department's administrative rule that states a rifle club formed for the benefit of its members is not a charity because the club's "primary purpose is not to provide a direct benefit to the public." OAR 150-307.130-(A)(3)(b). *Page 11 
In this case, Plaintiff has 100 volunteers who donate over 20,000 hours each year. (Def's Ex G at 2.) While Plaintiff's volunteers receive free admission passes to the subject property for themselves and guests, that is distinguishable from SamaritanVillage and the example in the department's administrative rule. First, unlike the senior living facility in SamaritanVillage and the rifle club example in the department's administrative rule, the subject property is open to the public; membership or volunteer work is not required to gain admission. OAR 150-307.130-(A)(3)(b). The volunteer labor benefits the volunteers by allowing them to enjoy the subject property, but it also provides a "direct benefit to the public" by allowing members of the public to enjoy the subject property as well. Second, by encouraging volunteers to visit the subject property with guests, Plaintiff is furthering its purpose of educating the public to "enhance awareness, appreciation, respect, and care of the environment and all life forms in it." (Ptf's Ex 1 at 27.) The labor provided by the volunteers allows the volunteers, guests of volunteers, and members of the public to receive a beneficial educational experience at the subject property. That factor weighs in favor of Plaintiff.
Donations received is another factor to consider when examining an organization's gift or giving. Plaintiff receives a large portion of its income from grants and donations. In 2009, over 71 percent of Plaintiff's total revenues came from grants and donations.[3] InSamaritan Village, the court stated that donations "suggest a public determination that [an organization] is charitable." TC-MD No 001064C at 12. Although receiving donations is not enough by itself to find that Plaintiff is a charitable organization, that factor weighs in Plaintiff's favor. The donations received by Plaintiff suggest that the public considers Plaintiff to be charitable. *Page 12 
The court in Samaritan Village also considered below market rents. TC-MD No 001064C at 11. The department's administrative rule states: "Often, a charitable organization's product or service is delivered to recipients at no cost or at a price below the market price or price to the organization of the product or service." OAR 150-307.130-(A)(3)(d). In Dove Lewis, the Supreme Court found that the plaintiff's fee structure weighed against granting a charitable exemption:
 "Although the initial donation * * * to start up the clinic may have been given in the spirit of charity, taxpayer was formed with the expectation that it would be self-sufficient. As a consequence, its fee schedule was, and is, structured to cover all costs. Unlike most charitable corporations, which depend on the receipt of donations for their survival, taxpayer's reliance on such funding is minimal."
301 Or at 430-31. In contrast, the court in SamaritanVillage, found that the plaintiff's fee structure was a factor in favor of granting a charitable exemption because the plaintiff's rates were "roughly 40 percent" below market. TC-MD No 001064C at 13. The court reached a similar conclusion in RigasMaja, Inc. v. Dept. of Rev. (Rigas Maja),12 OTR 471 (1993) where the plaintiff's rates were 10 percent to 33 percent below market. Samaritan Village, TC-MD No 001064C at 12 (citing Rigas Maja, 12 OTR at 474).
This case is distinguishable from Dove Lewis because Plaintiff's admission fees are not structured to "cover all costs." OAR 150-307.130-(A)(3)(d). In contrast, admission fees cover only the cost of food for the birds, which is 12.6 percent of Plaintiff's total expenses, and constitute only 12.5 percent of Plaintiff's total income.[4] Unlike the taxpayer in Dove Lewis, Plaintiff in this case is not self-sufficient. As discussed above, 71 percent of Plaintiff's income in 2009 came from grants and donations. (Ptf's Ex 1 at 32.) This case is more closely analogous to SamaritanVillage and Rigas Maja. While market price cannot be directly compared to the *Page 13 
price of providing a service, the department's administrative rule states that charging either below market rent or a price below what it costs the organization to provide the service suggests an organization is charitable. OAR 150-307.130-(A)(3)(d). Plaintiff's fee structure, in that respect, is a factor that weighs in Plaintiff's favor.
The court finds that the factors discussed above, taken as a whole, weigh in favor of the conclusion that Plaintiff's activities satisfy the requirement of gift or giving.
C. Performance in Furtherance of Plaintiff's CharitableObject
The final prong of the SW Oregon test requires that Plaintiff perform "in a manner that furthers its charitable object." SWOregon, 312 Or at 89. The activities of the organization "must be for the direct good or benefit of the public or community at large. Public benefits must be the primary purpose rather than a by-product. An organization that is established primarily for the benefit of its members is not a qualifying charity." OAR 150-307.130-(A)(3)(b). A charitable institution's "dominant purpose must be doing good to others rather than being organized for the convenience of those who use its services." U.S. Atheists v.Multnomah County Assessor, TC-MD No 0011083E, WL 34148929 at *3 (June 18, 2001) (citation omitted; internal quotation marks omitted). As discussed above, the subject property is open to the public generally and provides a benefit to the public. Furthermore, all of Plaintiff's income goes towards furthering its charitable objective of rehabilitating raptors and educating the public. The court concludes that Plaintiff has satisfied all three parts of the SW Oregon test and is a "charitable institution" within the meaning of ORS 307.130(2).
 III. CONCLUSION
After careful consideration of the evidence and testimony, the court concludes that Plaintiff meets all of the requirements necessary to qualify as a charitable institution within the *Page 14 
meaning of ORS 307.130. Accordingly, Plaintiff is entitled to property tax exemption under ORS 307.130 for the 2010-11 tax year. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs appeal is granted.
Dated this _____ day of September 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Pro Tempore Allison R.Boomer on September 12, 2011. The Court filed and entered thisdocument on September 12, 2011.
[1] Admission is $7 for adults, $6 for teens and seniors, and $4 for children 12 and under. (Ptf's Ex 1 at 56.)
[2] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.
[3] Grants: $39,581; contributions: $84,009; sponsorships: $23,088; in-kind donations: $57,561; fund raising events: $4,417. Total donated funds: $208,656; total revenues: $292,936. (Ptf's Ex 1 at 32.)
[4] Revenues for 2009 totaled $292,936, $36,704 of which was admission fees. (Ptf's Ex 1 at 32.) Expenses for 2009 totaled $271,649, $34,335 of which was spent on food and medicine for the birds. (Ptf's Ex 1 at 33.) *Page 1